344

J. F. OCHELTREE, Plaintiff and Respondent, v. LOUIS OZSGYANYI, Defendant and Appellant; ERNEST OZSGYANYI, Intervener and Appellant.

Atkins & Jacobson and Robert K. Grean for Appellants.

Pray, Price, Williams & Deatherage and William C. Price for Plaintiff and Respondent.

LILLIE, J.—In October 1958, Ocheltree sued Louis Ozsgyanyi for dissolution of a partnership between him and Louis, accounting and receivership. Louis in his verified answer denied the existence of the partnership, claiming sole ownership. On pretrial the court appointed Travis White, a certified public accountant, to make a complete audit. Three days after the audit was filed, Louis' counsel filed a complaint in intervention on behalf of Louis' brother, Ernest, against Ocheltree and Louis, alleging two partnerships—one, composed of Ocheltree, Louis and Ernest, known as the Fleet Locker Club, the other composed of Louis and Ernest, known

as the "Trade Winds Tahiti"; and praying for a declaration of partnership, and in the alternative, for an award of the reasonable value of his services as an employee. Louis answered admitting the two partnerships alleged by Ernest. Ocheltree answered denying any partnership interest of Ernest and alleging that he (Ocheltree) and Louis were sole partners, and that Ernest was only an employee. Heard without a jury, the trial court found that there existed only *one* partnership, consisting of Ocheltree and Louis, and that Ernest was solely an employee; determined the interest of the partners, awarding Ocheltree and Louis equal shares, but charging Louis with certain shortages; fixed the value of Ernest's services at $55,200; and appointed White receiver to dispose of the property. Pending final accounting, Louis and Ernest substituted new counsel and the case was reopened at their request; they were permitted to and did recall certain witnesses and present new evidence.

Both Ernest and Louis appeal from the judgment. Ernest assigns error to his denial of partnership status and, in the alternative, if he is an employee, challenges the amount fixed as the reasonable value of his services. He does not question the finding that there is but *one* partnership. Louis claims error in charging him with certain shortages. He does not dispute the finding that but *one* partnership exists or that it consists of *him* and *Ocheltree*.

One cannot read the lengthy record in this case without being impressed by the surreptitious manner in which, gradually over a period of time and without the knowledge and consent of his partner, Louis attempted to divert a substantial business from a partnership to his sole ownership; and by the advantage his brother Ernest sought to take of the situation for his own profit. ▮▮ In connection with both appeals the only question is one of sufficiency of the evidence. The trial judge having heard and observed the witnesses, determined their credibility and the weight to be given their testimony, and resolved all factual conflicts in the evidence, we will not disturb his findings. Evaluation of conflicting evidence does not come within the purview of this court. (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183] ; *Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689].) Thus, with these rules in mind, and viewing the evidence in a light most favorable to respondent and indulging all reasonable inferences in favor of the findings and judgment (*Grainger* v. *Antoyan*, 48 Cal.2d 805 [313 P.2d 848]), we conclude that the record contains

more than ample evidence to support the judgment of the lower court. (*Primm* v. *Primm,* 46 Cal.2d 690 [299 P.2d 231].)

Beginning in 1938, Ocheltree and Louis operated a locker club business with one Buckalew as partners until 1943. In 1946 they bought out Buckalew and formed a partnership known as the Fleet Locker Club, infusing the business with $16,000 capital. In January 1947, at the request of Louis, but with the consent of Ocheltree who was in the service, Ernest came to work for them. He was solely an employee and his duties never changed; he lived on the premises, ate his meals at the club restaurant, and drew approximately $50 per month from the cash register. In 1953 there was a profit of $49,518.61, a net book capital of $112,907.91, few obligations and $50,000 cash on hand. About this time the site of the business was condemned and Ocheltree and Louis decided to buy a lot. Although Ocheltree looked at various sites, Louis handled the transaction and, then unknown to Ocheltree, took the property in his own name.. They paid mostly cash for the lot. In 1953, Ocheltree and Louis signed an application for a general liquor license (Ex. 4), which was purchased for $5,000 with Fleet Locker Club funds; then unknown to Ocheltree, Louis had the license issued in his name alone. After acquiring the lot, they decided to build and Louis handled the financing and details of construction; then unknown to Ocheltree, Louis borrowed money and executed contracts in his own name. In late 1955 or early 1956, when the building was completed, they moved into it the entire Fleet Locker Club business—tailor, pressing and cleaning shops, locker club, and merchandise store; thereafter, with Fleet Locker Club funds they started additional businesses there—a restaurant, barbershop and liquor store— operated by the same personnel paid with Fleet Locker Club checks. Beginning in 1956, Louis, then without knowledge of Ocheltree, proceeded to conduct and operate the business as his own, hired Ringler, a bookkeeper, and had him set up books for two enterprises—the Fleet Locker Club and, what he called the "Trade Winds Tahiti" (representing the new businesses). From 1956 on, unknown to Ocheltree (and Ernest), Louis claimed the "Trade Winds Tahiti" as his own, excluding it from the partnership returns, causing his own personal income tax returns to show him its sole owner, and instructing Ringler to report the profit and loss from the "Trade Winds Tahiti" as his individual proprietorship. Ocheltree did not see the partnership returns for 1952 through 1957 and had no knowl-

edge they showed anything other than a partnership between him and Louis. However, when Ocheltree again returned from the service in 1958 and Louis began to represent himself as sole owner, Ocheltree obtained copies of the returns from the Department of Internal Revenue and for the first time discovered that part of the business had been excluded therefrom and Ernest was listed for a one-third partnership interest in the remainder. Prior to 1958, Ocheltree had never heard anyone, including Louis and Ernest, say that Ernest claimed to be a partner in the Fleet Locker Club or in any other business, or that Louis claimed to be sole owner. Around the same time in 1958 Ocheltree refused to sign his personal income tax return prepared by Ringler for it showed his income to have dropped considerably. He requested additional time within which to file it, consulted counsel, learned of the figures on previous returns prepared by Ringler, and discovered that his name thereon had been forged. He then brought the within action.

Ernest asserts, but has failed to demonstrate, that the finding—he is not a partner—is unsupported by sufficient evidence (*Nichols* v. *Mitchell*, 32 Cal.2d 598 [197 P.2d 550]) ; his brief consists of only a recitation of the evidence favorable to him and an argument based thereon more properly directed to the trier of fact. Notwithstanding his disregard of the Rules on Appeal, we have examined the record. As far as we can ascertain, Ernest's claim to partnership status stems from a conversation, he says took place in 1953, which gave him a one-third interest in the business in exchange for six years (1947-1953) of ''unpaid'' labor. However, the plaintiff's evidence denies any such conversation or business arrangement; and Ernest's own case fails to establish what, if anything, was said in the presence of Ocheltree which could possibly give rise to an agreement giving him a partnership interest in the business. Nor does the evidence show that in 1953 he had sufficient ''back pay'' coming to justify a one-third partnership in a business as extensive as the Fleet Locker Club. Moreover, official documents executed in the regular course of business from 1952 through 1958 reveal only two partners, Ocheltree and Louis, as sole owners; and neither Ernest's nor Louis' conduct in the business during those years was consistent with Ernest's present partnership claim.

The plaintiff's evidence shows that in 1947 Louis hired Ernest, a former shipping clerk; his work was that of a clerk and jack-of-all-trades. It is undisputed that from 1947 to

1953 he was merely an employee; his duties thereafter through 1958 never changed. Ocheltree told Louis to pay him and Ernest received a living from the locker club and in addition $50 a month cash. He spent considerable time around the business, but he lived and ate on the premises and apparently was a man of modest tastes and few outside interests. Ocheltree at no time ever had a conversation with Louis, Ernest or both that would in any way suggest that Ernest was, or ever would be anything, other than an employee; and Ocheltree never considered Ernest as anything else. Prior to 1958 he heard nothing from anyone, including Ernest, that he claimed to be a partner; and was unaware of what the partnership returns showed. Ocheltree never had any conversation with, or in the presence of, Louis, Ernest, Ringler or anyone else concerning Ernest as a partner or as having any interest in the business.

In addition, are numerous official documents (application for liquor license (Ex. 4), liquor license, sales and use tax returns (Ex. 5), application for and sales tax permit (Ex. 6), employer's application for identification number under F. I. Act (Ex. 7), federal tax returns (Ex. 8), records in state Department of Employment, returns and reports of wages under Unemployment Insurance Act (Ex. 9), tax returns (Ex. 10), contribution return and report of wages (Ex. 16), license for "Trade Winds Tahiti," and various letters to state officers) filed with governmental agencies in the regular course of the partnership business from 1952 through 1958, which not only do not mention Ernest's name but specifically name Ocheltree and Louis as the sole partners and owners of the business, and show that Ernest (who personally prepared and filed them and even signed many of them for Louis) neither claimed any interest in the business nor placed his name thereon as a partner or owner.

Moreover, Ernest admitted—that after the action was filed Louis told him he was nothing "but a damned employee"; that, while claiming in his complaint to be a partner in two partnerships, he understood he was to be a partner with Louis only in the new businesses; that he did not intervene to assert his interest until a year after Ocheltree filed his complaint, following the completion of the audit ordered by the court; and that all the time he wrote checks for the business he signed Louis' name, never his own. Claiming that a conversation in 1953 gave him a partnership interest for past "unpaid" services, Ernest could not produce his income tax

return for 1953 based upon and declaring receipt thereof; further, his tax return for 1955 showed $1,000 in taxes withheld for him as an employee (Ex. A). Also his tax return for 1952 (Ex. C) showed $11,600 income from the Fleet Locker Club (entirely inconsistent with his claim that he was unpaid for the six years immediately prior to 1953). When shown the partnership tax return listing him as a one-third partner and signed by him, Ernest was reminded by counsel that while dated 1953, it was for 1952, a year prior to when he claimed he had the conversation which made him a partner; he replied, ''Gosh, I'm glad that made me a partner a whole year before.'' And Ernest was impeached on many points— relative to employment of his sister-in-law, sums of money paid out of business funds to his brother, Stephen, et cetera. Although Louis claimed Ernest was to receive a one-half interest in ''Trade Winds Tahiti,'' Ringler, Louis' accountant, testified that Louis instructed him from 1956 on, to report profits and losses from ''Trade Winds Tahiti'' as his (Louis') individual proprietorship on his tax returns; Ringler thus showed all profit on his personal return; none on Ernest's.

Ernest testified he came to work in response to a letter from Louis; it did not, however, mention wages, nor was there any conversation concerning the same—Louis merely told him he would be compensated. He lived on the premises, took his meals from the restaurant and drew about $50 in cash from the register each month. He said that in 1953 he demanded a showdown ''for six years of unpaid labor,'' upon which he placed a value of $18,000, and that it was his (Ernest's) and Louis' plan (denied by Ocheltree) that his ''back pay'' be used to purchase land for a new building for which he would become a third partner in the business. However, Ernest's testimony failed to in any way connect Ocheltree with this ''plan,'' and he could recite no conversation had with Ocheltree, or with Louis or anyone else in the presence of Ocheltree, from which it could be determined that any agreement was made concerning his back pay or that he was given any partnership or other interest in the business. Nor could Louis establish such a conversation; his testimony showed only a conversation with Ocheltree in which at one time he told him to go ahead and pay Ernest. Moreover, when Ocheltree and Louis bought the new site, the lot was placed by Louis in his (Louis') name. Ernest relies heavily on partnership tax returns showing him to be a partner; but it is clear that such declaration was made with-

out Ocheltree's consent or knowledge and that he did not see them until 1958 after which he filed this action.

The witnesses relied upon by Ernest either failed to support his claim, were impeached on material matters or were affected with bias. Louis' impeachment and his conduct in the courtroom cast considerable suspicion on his credibility, to the extent the trial judge commented on it. Instances of impeachment are numerous—his testimony relative to the liquor license and in contrast, his final admission (after the case was reopened and the court had made known its ruling) that he paid cash for it *and* an additional $6,000 ''under the table''; his denial that he forged Ocheltree's name on his personal income tax returns prepared by Ringler, in the light of testimony of Ralph Bradford, a handwriting expert, establishing that Ocheltree's name had been signed by Louis, and Mrs. Ocheltree's name by Ringler, and that of appellant's own witness, Florence Zakarjsatk, that Louis signed Ocheltree's name thereto; his testimony that he did not know the basis for many journal entries made by Ringler, disputed by Ringler's testimony that he based them strictly on what Louis told him; his production of six books of account at the trial after producing only two on deposition pursuant to a subpoena duces tecum to bring in *all* of the books, and his admission he had previously been ordered to produce all of them; his evasion relative to a personal bank account and the subsequent production of bank records establishing that he not only had such an account but $92,672.67 had gone through it in a short time; and his evasive, abusive, profane conduct when counsel tried to cross-examine him relative to the money, his response that ''the whole thing is crooked,'' his refusal to answer further questions and his exit from the courtroom and failure to return to complete the cross-examination.

In the alternative, Ernest contends that the trial court failed to reasonably fix the value of his services as an employee; stated properly, the issue is whether the evidence is sufficient to support the finding that he was entitled to no more than $55,200. Again appellant presents a factual argument based entirely upon testimony favorable to him, resorting to a plea of faithful service for 13 years. The trial court, considering the living he had received from the Fleet Locker Club, the monthly sums he drew from the cash register during that time, his prior experience and training, his duties, and the nature and quality of service he performed, determined

the rate of pay to be $300 per month for the first 6 years, and $400 for the last 7.

Immediately prior to coming to work Ernest received a maximum salary of $250 a month for six years as a shipping clerk; he had no previous experience or training for work at the Fleet Locker Club. He conceded nothing was said about wages, only that Louis said he "would be taken care of . . . be compensated." In addition to his room and board he drew various sums of money approximating $50 per month from the cash register, sometimes on IOU's which he did not keep, or destroyed; he kept no records but drew enough to buy clothing, go to the movies, et cetera. He testified that in 1947 or 1948 he inquired about wages but nothing was done about it; that in 1952 or 1953 he asked for $18,000 for the six years ($3,600 less than the court awarded him), but no one promised to pay him or agreed to any amount. While he claims Louis once mentioned $5.00 to $10 an hour, he swore in his deposition that nothing was ever said to him about compensation. We find nothing in the record from which the trial court could have found any agreement to pay Ernest any specific amount for his services; or any acknowledgment that any sum therefor was due him. Thus, if Ernest is to recover it must be on a *quantum meruit* basis; and the reasonable value of the services rendered became a question of fact for the trial judge.

Louis ran the business except when Ocheltree was present. Ernest now claims he was the manager, but the evidence does not bear this out; it shows his work was the same as the other clerks, who were paid $1.25 to $1.50 an hour and as a "jack-of-all-trades"; and that he had no power to make decisions and had no authority to hire and fire or "be boss." But regardless of what he did his services were of such questionable value as to hardly justify the sum awarded; on a competitive basis he might well have been fired. He claimed he conducted a "single-handed operation" of the business during the Korean War; if this be true, it is fortunate the conflict ended when it did, for Ernest who, during this time, displayed a complete lack of business acumen, a basic inability to handle even the simplest money transactions, and an absence of responsible business conduct, permitted it to operate with virtually no records and thousands of dollars of shortage. For example, in 1956 a shortage of $22,650 had to be written off, for, as Ringler testified, "the cash was not there so we had to adjust it"; business funds were not timely and prop-

erly deposited but kept in large sums on the premises; no record was kept of refunds, loans or vending machine receipts, no effort was made to collect loans, no deposit was made of plumbing checks; no figures relating to receipts or losses were ever given to Ringler or discussed with him, Louis or Ocheltree; shortages in the cash register ran approximately $100 per month, but beyond pleading with the employees not to steal anymore, he took no action and the losses continued; and monies were given out and never returned ($4,650 to Stephen, his brother, and $5,000 from restaurant receipts). Little wonder, after hearing Ernest's method of doing business as "manager," the court observed: "My amazement continues to increase." That the manager of the O. C. Locker Club received $150 a week hardly aids Ernest, for the former was the owner's son-in-law, and the quality of service was not at all comparable. The owner of the O. C. Locker Club, asked if he would pay a manager in the Fleet Locker Club $150 a week, was shocked to learn that it made only $6,534.21 in 1956 and $10,641.41 in 1957, and chalked it up to bad management that *he* would do something about.

Ernest's last contention relates to a deduction from his award of $18,287.13 for income taxes paid for Ernest by the business on behalf of his "partnership earnings" during the years he was listed as a one-third partner on the partnership returns. The trial judge called this a credit due Ernest from the Department of Internal Revenue. From 1953 on, the partnership tax returns, without the consent or knowledge of Ocheltree reported one-third of the total net income of the Fleet Locker Club operation as a three-way partnership division of profits as income to Ernest. It is upon these returns he placed great reliance to support his claim he was a partner. But now he confesses he really did not receive any "partnership earnings" as reflected in the returns, and the deduction is unfair. Nevertheless, with Ernest's knowledge, his individual income tax based thereon in the sum of $18,287.13 was paid from business funds from 1953 to 1958; Ocheltree was unaware of this. Ernest's argument that he has little chance of receiving credit for this sum from the Department of Internal Revenue, the court should penalize the partnership, not him, and he will be heavily taxed on receipt of the lump-sum compensation, goes outside the record; nor was it considered by the court below for it observed that the question of state and federal taxes was not one of the issues before it.

Louis contends that the evidence is not sufficient to sustain

that portion of the judgment charging against his capital account certain shortages disclosed by the audit and that the accounts in the audit report were impeached and the auditor was biased.

White, the court-appointed auditor, made a complete audit of the business and filed his report around September 1, 1959. The trial began January 4, 1960, and concluded in November. While Louis had every opportunity to have an audit made by his own accountant and offer it to dispute the verity of White's audit, he did not do so; nor did he object at the time White testified, although he now claims the report was so negligently prepared and with such little information as to render it wholly unreliable. During the trial Louis made no effort to show the shortages did not exist, and the only time he tried to explain them was on reopening (after the court advised the parties of its ruling), when he offered documents never before brought to the attention of White or produced at the trial (they were then at the request of the court considered by White who testified they did not alter his report) and testimony of political contributions and other expenses he previously refused to disclose.

His position discounting White's audit because its accounts were impeached and he was biased, is not here well taken. The credibility of witnesses and the weight to be given their testimony are matters within the sole province of the trier of fact and are not subject to review. (*Blank* v. *Coffin,* 20 Cal. 2d 457 [126 P.2d 868]; *Shields* v. *Shields,* 200 Cal.App.2d 99 [19 Cal.Rptr. 129]; *Church of Merciful Saviour* v. *Volunteers of America,* 184 Cal.App.2d 851 [8 Cal.Rptr. 48].) Moreover, the evidence fully supports White's audit accounts, and the record is replete with proof of Louis' deliberate failure to cooperate with White, his evasion and refusal to answer questions during trial, and his contemptuous conduct in the presence of the court.

Louis told White "he was the one responsible for the cash and he was running the place," and "was taking care of everything"; thus, White told him if claimed expenditures could not be substantiated or shortages could not explained, they would be treated as money withdrawn by him, and charged against his capital account. Nevertheless, Louis failed to supply him with the necessary records or explanations; he is now hardly in a position to complain that the audit accounts are not based upon sufficient information. For example, until he offered checks to the trial court on his own

behalf to claim contributions of capital to the partnership, Louis never made records of his personal bank account available to White; the court, however, then asked White to consider them, and after examining them White testified that while they did not change the *amount* of shortage existing, they did establish it to have occurred in a different year but it still did not change the status of Louis' capital account. Also, from the same checks, finally produced by Louis in court, White, at the court's request to examine them, found the total deposits in Louis' personal savings account during the period in question to be $65,300, of which $65,000 was from checks written by the Fleet Locker Club ($25,000 was deposited by Louis in a new account with the Long Beach Savings and Loan Association, and $40,000 in his savings account); when previously auditing the books, White found the $65,000 shortage but Louis would supply him no information concerning it or account for expenditures in that amount he claimed he made, even though he talked to him on several occasions and asked him questions. White's audit is the result of records and information supplied by Ringler and Louis; if Louis' failure to explain or cooperate with White resulted in any error, it was either reconsidered by White during the trial in the light of Louis' testimony or it was such as not to alter the overall status of the capital accounts of the two partners.

Nor do we find any bias against Louis on the part of White; to the contrary, the evidence reveals a willingness and determined effort on the part of White from the very beginning to secure all available information, that Louis might be allowed credit for the shortages. White repeatedly asked Louis for explanations and information relative to all shortages, little if any were given; whenever Louis claimed a legitimate expenditure to cover a shortage and he was able to substantiate it, White without further question allowed him credit, even accepting names and amounts he gave him for political contributions without verifying them; to accord Louis credit White even accepted some of Ringler's journal entries without verification and under most questionable circumstances; and with the limited information afforded White, he did his best to investigate on his own and even sought assistance from others without success. That White did not exaggerate Louis' lack of cooperation, is borne out by Louis' conduct throughout the trial and after the case was reopened.

Colloquy between appellant's counsel and the court reveals there was no serious question of shortage, appellant's

main concern being "the question of the charge of the shortage"; however, inasmuch as he now disputes the amount, we briefly recite the evidence in that regard. The shortage of $65,000 consists of $22,650 in 1956, $37,982.93 in 1957, and amounts totalling approximately $3,000 in two other years. Relative to the $22,650 shortage, according to Ringler, "the cash was not there so we had to adjust it." Ringler's journal entries to cover this show round figures for such items as promotion, contributions, adjustment, auto expenses, et cetera. No one could justify these figures with cancelled checks, receipts or other information. Finally Ringler admitted there was no basis for these entries except what Louis told him "about these amounts." On the other hand, Louis was given an opportunity to explain what happened to the $65,000, first to White, then to the court, but he did not do so, admitted the entries to be fictitious and finally asserted the amount had been used for political contributions; repeatedly asked by White to supply names and amounts, Louis did not do so; repeatedly queried during the trial about this, he would make no explanation. Finally, upon reopening, he was again asked how the $65,000 was spent and no reasonable explanation forthcoming, the trial judge advised his new counsel that during the trial he had been asked repeatedly about it but he did not "favor us with an answer." Of this amount a shortage of $22,650 existed in 1956, which could be explained neither by the bookkeeper nor by Louis, who was in charge. Thus the only reasonable conclusion under the evidence is that Louis caused the bookkeeper to make the fictitious entries to cover it and the amount was withdrawn by Louis for his own account. Relative to the shortage of $37,982 in 1957, the books Louis authorized Ringler to keep for the "Trade Winds Tahiti" showed that this amount had been paid out of "Trade Winds Tahiti" to the Fleet Locker Club; but the Fleet Locker Club books failed to show the receipt of any such sum. When asked about it Louis could or would not verify or support the transfer of funds and failed to explain why Fleet Locker Club books did not reflect the same. Finally Louis represented that it too had been used for political contributions, but did not furnish names or amounts. Appellant's argument that the $37,982 was used to cash payroll checks for the Fleet Locker Club is not supported by the record; further, the amount on its books was not the same—far in excess of $37,982. During the trial, in the face of undisputed evidence he was solely responsible for the cash and bookkeeping and

had produced $35,000 in cash for White to count, Louis refused until a receiver be appointed to account for a shortage of $25,000 occurring from August 25, 1959, to February 1, 1960 (the period between pretrial and trial).

As urged by appellant, his political activity may well have accounted for some of the cash expended, but considering the profits and extent, value and kind of business, it would be absurd to say that in two years political contributions amounted to $65,000; moreover, when Louis could supply names and amounts for political contributions he was given credit for them. And of course, fatal to Louis' contention is the shocking evidence that during this period $65,000 traced to the business, went into Louis' personal bank account. Both the issue of shortages and overages are factual and the trial court obviously rejected Louis' version of how the money was spent. And of no little significance is Louis' courtroom conduct. On the stand during the trial he was evasive and in part misleading and frequently impeached. Cross-examined upon reopening of the case, he became profane, impatient, highly agitated and insulting, and finally in response to a proper question relative to a disputed $100,000, he said: "Why don't you start doing things right. My God, could I leave please." When the court asked him if he did not wish to have his side of the case presented, Louis retorted to the court, "You people don't understand, come on, Ernie lets get out of here. We'll just give it to them, the whole thing is crooked." With this he walked out of the courtroom and did not return. The court, commenting that the questions were perfectly proper, then said, "The court can only draw inferences adverse to him for his refusal to answer these questions," and referred not only to "misconduct this morning at court (but) on previous occasions in this courtroom."

As to who should be charged with the shortages, we see in the evidence no basis for conflict. Louis always insisted that he ran the business alone, was solely responsible for handling the cash, the bookkeeping part of the business and all business transactions. There is no evidence that Ocheltree ever had any connection with the books or cash or ever had access to it during the period in question.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 21, 1962.