[Civ. No. 10550.    Third Dist.    Sept. 16, 1963.]

BERNARD M. WECHSLER, Plaintiff and Respondent, v. CAPITOL TRAILER SALES, INC., Defendant and Appellant.

McPherson & Mulkey and Loyd H. Mulkey, Jr., for Defendant and Appellant.

Archibald D. McDougall for Plaintiff and Respondent.

JANES, J. pro tem.*—Defendant corporation appeals, after trial by the court, from a judgment entered against it in plaintiff's suit to recover the final month's salary of a one-year employment contract and 10 per cent of the net profits, during the contract period, of certain corporations named in the contract and affiliated with defendant corporation.

The background evidence, which is not in conflict, discloses that commencing with the incorporation of defendant corporation, in 1952, plaintiff and Oscar Hottinger organized and incorporated the six trailer sales, insurance and finance companies whose activities are the subject of this appeal. The corporations were at all relevant times separate and distinct companies, operating under their separate franchises and maintaining independent records for accountability of their operations and for taxation of income. In fact, however, they constituted an integrated business, both in ownership and operation. The insurance company sold policies upon the sales contracts, and the finance companies bought the contracts delivered to them by the sales companies. Neither the insurance company nor the finance companies did general brokerage or handled financial transactions for outside interests; they concerned themselves only with the transactions

---

*Assigned by Chairman of Judicial Council.

generated by the sales companies. Administrative costs, including the salary of the general manager, were paid by defendant corporation, but each of the other corporations was charged by the business accountant with its pro rata share of such administrative cost. The office of defendant corporation (one of the sales companies) was located in West Sacramento, California, and was the home office and general headquarters of the other corporations as well.

Plaintiff and Hottinger, the principal stockholders, operated the businesses from 1952 until January 1958. At that time plaintiff sold his interest in the corporations to Ely Whitney and completely withdrew from the corporations and their operations. In June 1959 John Dussault and Gordon Dick acquired, first, the interest of Hottinger, and then the interest of Whitney in the corporations. Upon this purchase Dussault and Dick became directors as well as stockholders of the corporations, and they took office, respectively, as president and vice president of each of the corporations. Neither Dussault nor Dick had any prior experience in the trailer business.

At this critical juncture the corporations were in need of a general manager as Whitney had discharged John Edge, the general manager, in May, just prior to transfer of the Whitney interest to Dussault and Dick. About June 15, 1959, therefore, Dussault, then president of defendant corporation, and knowing of plaintiff's experience with the companies and the business, telephoned plaintiff at plaintiff's home in Sacramento. Dussault invited plaintiff to meet with Dussault and Dick at Dussault's Sacramento hotel for the purpose of discussing plaintiff's possible employment by the company. Plaintiff complied, and following a discussion with Dussault and Dick concerning the operations of the companies and the details of plaintiff's employment as general manager, an employment contract prepared by plaintiff's attorney was signed about July 1, 1959, by plaintiff and by Dussault, as president of defendant corporation. The contract contains the following pertinent provisions upon the subject of the compensation to be paid to plaintiff:

"2. As compensation for said duties, Company agrees to pay to Employee the following:

"a. An annual salary of $18,000.00.

"b. In addition to said annual salary, ten percent (10%) of the net profits to be derived from the activities of the various corporations hereinafter mentioned, provided that

the aggregate of items a and b shall not exceed the sum of $25,000.00.

"3. For a definition of profit participation as mentioned in Paragraph 2b hereinabove, it is expressly understood and agreed that said profits shall consist of all profits computed in accordance with the generally accepted accounting principles before payment of Federal income taxes and shall include such profits of the following corporations: CAPITOL TRAILER SALES, INC.; CAPITOL TRAILER SALES OF REDDING; CAPITOL TRAILER SALES OF FRESNO; CAPITOL TRAILER FINANCE COMPANY; CAPITOL HOME FINANCE COMPANY; and MOBILE HOME INSURANCE AGENCY, and any other company which may hereafter be formed in this line of business by the existing stockholders of these corporations, or any of them."

Plaintiff entered upon his employment July 1, 1959, pursuant to the contract, and served defendant as general manager[1] until May 20, 1960. He was paid the sum of $1,500 at the end of each month for a period of 11 months. On May 20, 1960, he was discharged by Dussault, and on that date he received a note under the letterhead of defendant corporation, reading as follows:

"May 20, 1960

"Capitol Trailer Sales will continue to pay Bernie Wechsler until June 30, 1960 even though he will not be working from this time to this, unless called upon.
May 20, 1960

/s/ John A. Dussault"

The circumstances under which the foregoing note was executed and delivered to plaintiff are in dispute. Plaintiff testified that Dussault called him into the office; told plaintiff that he had bought out his partners, was now sole owner of the businesses, that he felt that he now knew the business well enough to run it himself the way he would like to run it, and that he would no longer need plaintiff's services. Plaintiff further testified that Dussault gave him his salary check for the month of May, but that when plaintiff asked for his check for the balance of the contract Dussault said, "No, I will give you a letter that you will get it next month," and had the bookkeeper prepare the foregoing note, which Dussault signed and delivered to plaintiff. Everything was

---

[1]The employment contract contains no provision as to the capacity in which plaintiff was to serve, but it is conceded that his duties were managerial; his position is variously described as "general manager," "sales manager" and "supervisor-sales manager."

friendly between the two of them at that time, and according to plaintiff there was no argument.

Dussault testified, in substance, that at the meeting of May 20th he discussed with plaintiff the reasons for his discharge; that by this time a disagreeable situation in fact existed by reason of plaintiff's inattention to duty, his failure to communicate certain valuable business information to the firm, his sleeping on the job, and other conduct which, if true, would justify Dussault in discharging plaintiff; and that he discussed these matters with plaintiff at the meeting. Dussault also testified that he gave plaintiff the foregoing note under duress, after he had discussed with plaintiff the reasons for the discharge, because plaintiff requested the note and refused to leave the company premises until Dussault gave him the note; that plaintiff by that time was creating a scene in the presence of several customers of defendant.

Following the incident of May 20th, on a Thursday in June 1960, plaintiff returned to Sacramento from Los Angeles, at the request of Dussault, and appeared as a witness for defendant corporation in a suit against one of its former employees. On the following Saturday, at 8 a.m., Dussault telephoned plaintiff, who had remained in Sacramento, and called upon plaintiff to come to work that day. Plaintiff refused, for reasons which the trial court found to be sufficient.

The end of June plaintiff called at defendant's office and requested his final check. Dussault refused to pay him, and this action followed.

The trial court found that plaintiff was discharged without cause and awarded plaintiff his salary for the month of June, in the amount of $1,500, pursuant to the contract. Further, upon concluding that the contract, in unambiguous terms, provided that plaintiff was to receive, as additional compensation, 10 per cent of the net profits of each of the corporations which made a profit, without reduction or charge against plaintiff for the net losses of any of the corporations which suffered net losses, the trial court awarded plaintiff the additional sum of $3,535.30, representing 10 per cent of the net profits of the insurance company and the two finance companies.[2] It is the latter portion of the award to which the appeal is primarily directed.

---

[2]The accounting evidence, received by stipulation, discloses that during the period July 1, 1959, through June 30, 1960, each of the first three listed corporations (the sales companies) suffered a net LOSS, the

We turn first, however, to defendant's attack upon the judgment awarding plaintiff his salary for the final month of June. It is defendant's position that plaintiff was discharged for cause, and this defense is raised affirmatively in its answer to plaintiff's complaint. The specification upon appeal is that the trial court erred in unduly limiting the examination and cross-examination of certain witnesses, thereby hindering the efforts of defendant to establish cause for plaintiff's discharge.

■ Defendant first contends that the trial court unduly restricted its cross-examination of plaintiff. On direct examination plaintiff's only testimony upon the subject of his discharge related to the May 20th meeting with Dussault. In the course of his direct testimony plaintiff related the incident and the conversation hereinbefore set forth, the substance of which is that Dussault called plaintiff into the office, told him that his services were no longer needed, gave him his check for the month of May and the written promise for the next month's pay, and that there was no argument between them.

Upon cross-examination of plaintiff, counsel for defendant sought to inquire whether on occasions during the period of employment plaintiff had withheld valuable business information from defendant; whether plaintiff was accompanied by a female acquaintance on a business trip, at defendant's expense; whether plaintiff frequently slept during business hours; and as to other instances of alleged misconduct—all relating to occasions during the period of employment but prior to the incident and conversation of May 20th. The court sustained objections to all such questions, ruling that the questions were beyond the scope of plaintiff's direct examination, but in each instance reserving defendant the right to go into such matters on its defense under section 2055 of the Code of Civil Procedure.

Defendant vigorously asserts that the court's rulings seriously prejudiced the right of defendant to inquire into matters bearing directly upon award of the June salary, in

aggregate of which was the sum of $126,545. During the same period each of the remaining corporations (the insurance company and the finance companies) showed a net PROFIT; the total net profit for these corporations amounted to $35,353. (Ten per cent of this amount, the sum of $3,535.30, is the amount plaintiff was awarded on account of his share of the net profits, in addition to the sum of $1,500, as salary due for the month of June.) Computed in the aggregate, therefore, the net LOSS of the six corporations, for the contract period, amounted to $91,192.

that such restriction of its cross-examination of plaintiff as to matters relating to discharge for cause put defendant in the position of having to defer such examination until its own case was presented, and afforded plaintiff an opportunity to hear the defense testimony before being himself examined upon the subject.

We find no error in the court's rulings. Such cross-examination was obviously designed to elicit facts in support of the defense that plaintiff had been discharged for cause. It was clearly material, upon the defendant's case, as a matter of defense, but such cross-examination exceeded the scope of plaintiff's direct examination and was improper. (*Smellie* v. *Southern Pac. Co.,* 128 Cal.App. 567, 573 [18 P.2d 97, 19 P.2d 982] ; Witkin, Cal. Evidence, § 628, p. 675.) We are mindful of the fact that the witness under examination was a party, as well as a witness, but it is our view that the cross-examination upon this point was not designed to test credibility or to properly explore the testimony given by plaintiff on his direct examination.

"California ... follows the ... rule restricting cross-examination to the *scope of the direct examination.* Thus, Code of Civil Procedure section 2045 refers to cross-examination of the witness upon the same matter' as the direct examination. And Code of Civil Procedure section 2048 provides: 'The opposite party may cross-examine the witness as to any facts stated in his direct examination or connected therewith.' If the cross-examiner goes beyond those matters upon which the witness testified in direct examination in his attempt to get new evidence, e.g., if a defendant attempts to prove an affirmative defense, he is actually making the witness his own and attempting to put on his own case in advance of the proper time, . . ." (Witkin, Cal. Evidence, § 627, p. 674.)

Moreover, the trial court's rulings did not, in any event, prevent defendant, prior to undertaking its defense, from examining plaintiff upon matters relating to discharge for cause, since defendant—as the trial court suggested—could have examined plaintiff upon this subject under section 2055 of the Code of Civil Procedure. And since defendant could have so examined plaintiff as its first witness, before putting on the remainder of its case (*Iloff* v. *Purity Stores, Ltd.,* 178 Cal.App.2d 1 [2 Cal.Rptr. 735]), its cause could not have been seriously affected by the questioned rulings. Although defendant did not exercise its privilege by calling plaintiff

under section 2055, many of the matters complained of were touched upon by defendant as a part of its own case. The testimony was in direct conflict on most of the matters, but the court resolved the conflict in plaintiff's favor.

■ Defendant next complains that the trial court unduly restricted the direct examination of Gordon Dick, a witness called by defendant in the presentation of its own case. It is contended that upon Dick's direct examination the court undertook, pursuant to a general ruling, to exclude testimony as to acts of misconduct by plaintiff which took place during his employment, but which were not in fact communicated to defendant's officers until after plaintiff's discharge. (See 6 Williston on Contracts, § 839, p. 143; Rest., Contracts, § 278, illustrating the admissibility of such testimony notwithstanding the fact that it is not communicated to the employer until after discharge of the employee.) The point does not aid defendant, however, as the record does not bear out its contention. On direct examination the witness Dick related a conversation with plaintiff in which plaintiff suggested to the witness that the two of them could start another trailer business in direct competition with the defendant and "drive ... [defendant] out of business within six months." The conversation took place during the employment period; the witness communicated the substance of it to Dussault some months after plaintiff was discharged. At this point the court stated: "The question is—I think here, gentlemen, he made these statements concerning this gentleman's activity, but he hasn't related them to the discharge. Now if these are statements made and not communicated, then they will be of no importance." Nothing was pending by way of objection or motion when the comment was made by the court, and no testimony was stricken or excluded as a result thereof. The testimony remained in the record and defendant was permitted to make a similar inquiry of another defense witness. The comment appears to have been no more than the court's opinion, at the moment, upon a point of law, and error may not be predicated thereon. The remark may not be used to impeach findings otherwise supported by substantial evidence or to attack the judgment entered thereon. (*City of Daly City* v. *Smith*, 110 Cal.App.2d 524, 529 [243 P.2d 46].)

The trial court found that plaintiff duly performed all of the conditions of the contract to be performed upon his part and that it is not true that he was discharged for cause. It concluded that he is entitled to his salary for the month of June in the amount of $1,500. Those findings are supported

by substantial evidence, free of error, and may not be disturbed. (*Ocheltree* v. *Ozsgyanyi,* 207 Cal.App.2d 344 [24 Cal.Rptr. 241].)

Lastly, we turn to defendant's attack upon that part of the judgment which awards plaintiff additional salary in a sum equal to 10 per cent of the total net profits realized by the three corporations which made profits. Defendant asserts that paragraphs 2b and 3 of the contract are ambiguous and unclear, for the reason that it cannot be ascertained from the language of those provisions whether the parties intended that plaintiff was to share only in the net *profits* of the corporations which prospered, or whether he was to receive the stated percentage of such profits less the net *losses* of any of the corporations which suffered losses. It is defendant's position that the provision for payment to plaintiff of additional salary in the amount of 10 per cent of the "net *profits* to be *derived* from the *activities* of the *various corporations* ... " creates an ambiguity in the contract which, although executed between plaintiff and a single corporation, contemplates use of the activities and profits of the several corporations as a base for measuring such additional compensation. And paragraph 3 of the contract, says defendant, does nothing to clarify the intent of the parties, as the reference therein is simply to "all profits" rather than to the profits of "each" or "any" of the corporations. (Italics ours.)

At the trial of the action both parties produced an abundance of evidence as to the circumstances surrounding execution of the contract and the conversations of the principals. The findings of fact, however, do not disclose what view the trial court took of the extrinsic evidence admitted, nor do they disclose how the court reached its determination as to the manner in which the contract was to be interpreted. The pertinent finding, which is set out below[3], provides simply, in

---

[3]"II The Court finds that on or about July 1, 1959, at Sacramento, California, plaintiff and defendant made and executed a certain agreement in writing, wherein and whereby plaintiff was engaged by defendant for a period of one year commencing July 1, 1959 and ending June 30, 1960, to perform certain services in connection with the management of the business of defendant, and wherein and whereby defendant agreed to pay plaintiff for such services an annual salary of $18,000.00, together with ten percent (10%) of the net profits derived from the activities of any of the following corporations, to-wit: CAPITOL TRAILER SALES, INC.; CAPITOL TRAILER SALES OF REDDING; CAPITOL HOME FINANCE COMPANY; CAPITOL TRAILER SALES OF FRES-

the substantial language of the contract, that in addition to an annual salary of $18,000, the parties agreed that plaintiff was to receive "ten per cent (10%) of the net profits derived from the activities of *any* of the following corporations [naming them]." The effect of the finding is simply to add the word "any" to the language of the contract as an indication of the manner in which the trial court interpreted the contract. There is thus no indication in the findings whether the trial court found the contract clear and unambiguous solely upon the language of the instrument itself, or whether it found the contract to be uncertain and resolved that ambiguity by weighing and taking into account the extrinsic evidence produced by the parties. (Italics ours.)

The situation presented is one in which we are permitted to examine the written opinion of the trial court, as defendant urges us to do, in order to learn the process by which the judgment was reached. (*Union Sugar Co.* v. *Hollister Estate Co.*, 3 Cal.2d 740, 750 [47 P.2d 273]; *Bailey* v. *Fosca Oil Co.*, 180 Cal.App.2d 289, 295 [4 Cal.Rptr. 474]; *Canepa* v. *Sun Pacific, Inc.*, 126 Cal.App.2d 706, 714 [272 P.2d 860].) We are mindful of the rule that the opinion of the trial court may not be used to impeach and annul the findings. (*Oldis* v. *La Societe Francaise*, 130 Cal.App.2d 461, 472-476 [279 P.2d 184], reviewing numerous cases on the proper and improper use of such opinions.) We believe, however, that the present case is one in which an examination of such written opinion is not only appropriate but revealing. "... ▮▮▮ The Rules on Appeal provide for incorporation of the written opinion of the trial judge in the record. (Rules on Appeal, rule 5(a); 22 Cal.2d 4.)[4] We may consider the opinion of the trial judge for the purpose of understanding and interpreting the findings. [Citation.] Obviously, that is one of the purposes of the provision enabling a party to an appeal to place the written opinion of the trial judge before the reviewing court, a practice which was merely tolerated prior to the adoption of the Rules on Appeal in 1943." (*Trans-Oceanic Oil Corp.* v. *City of Santa Barbara*, 85 Cal.App.2d 776, 790 [194 P.2d 148].)

Interpreting finding number II in the light of the court's written opinion, it appears clearly that the contract was

---

NO; CAPITOL TRAILER FINANCE COMPANY; and MOBILE HOME INSURANCE COMPANY; provided that the aggregate amount to be paid plaintiff by defendant for said salary and share of profits did not exceed the sum of $25,000.00 for the one year period alleged in the agreement."

4Now Cal. Rules of Court, rule 5(a).

found to be free of ambiguity based solely upon an examination of the language of the contract, without resort to the extrinsic evidence. The opinion frankly so states, and the trial judge, after analyzing the language of the contract and outlining the reasoning which led to his conclusion, rejected any consideration of the extrinsic evidence for the reason that it was, in his opinion, "inconsistent with the express provisions of the contract ... and may not be received to vary those provisions, clearly expressed." It is clear, therefore, that the questioned finding, wherein it adds the word "any" before the phrase "of the following corporations," expresses the conclusion of the trial judge that the contract, without ambiguity or uncertainty, was executed with the intent asserted by plaintiff.

Although the question whether a contract is or is not ambiguous or uncertain is a matter of determination, in the first instance, by the trial court, the question is one of law, and the trial court's determination is not binding on an appellate court. (*Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128, 133 [48 P.2d 13]; *Kerr* v. *Brede*, 180 Cal.App.2d 149, 151 [4 Cal.Rptr. 443].)

We agree with the defendant that the contract is ambiguous, and we have concluded, therefore, that the court's decision was erroneous. A contract is ambiguous when on its face it is capable of two different reasonable interpretations. (*Woodbine* v. *Van Horn*, 29 Cal.2d 95, 105 [173 P.2d 17]; *Pedersen* v. *Fiksdal*, 185 Cal.App.2d 30, 34 [7 Cal.Rptr. 874].) We believe such is the case here. Upon examination of the contract as a whole, the very question arises which provoked and is the subject of the present disagreement between the parties. Certainly it can be contended, upon a purely literal application of the term "net profits," that there was no intention to measure the additional salary base by considering any losses which the companies might suffer. It is equally reasonable, however, and consistent with economic reality, to conclude from the language of the contract itself, as it applies such term to the activities of a number of affiliated corporations, that the profits and losses of such firms were to be aggregated in the computation of plaintiff's additional salary. It cannot be determined from paragraph 2b, allowing plaintiff "ten percent (10%) of the net profits to be derived from the activities of the various corporations" whether "net profits" were to be computed upon each corporation separately, or in the aggregate. Para-

graph 3 really furnishes no additional aid to meaning or guide to what was intended. ■ The word "each" or "aggregate" or "any" or words of similar import must be read into the contract to make it clear and unambiguous. "Once something has to be read into a contract to make it clear, it can hardly be said to be susceptible of only one interpretation." (*Union Oil Co.* v. *Union Sugar Co.*, 31 Cal.2d 300, 306 [188 P.2d 470].)

■ It is the duty of the court, in the interpretation of a contract, to declare the meaning of what is written, not what was intended to be written. (*Barham* v. *Barham,* 33 Cal.2d 416, 423 [202 P.2d 289].) Where, however, the instrument is so uncertain as to leave the intention of the parties in doubt, as where it employs language susceptible of either one of two constructions, the intention may be shown by extrinsic evidence. (Code Civ. Proc., § 1856; *Woodbine* v. *Van Horn, supra,* p. 104; *Anderson* v. *Tahoe Keys, Inc.,* 202 Cal.App.2d 640, 644 [20 Cal.Rptr. 891].) "... When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties ..., not to show that 'the parties meant something other *than* what they said' but to show 'what they meant *by* what they said' ...." (*Barham* v. *Barham, supra,* pp. 422-423.)

■ It was apparently in accordance with the immediately foregoing rules, designed to aid the court in the performance of its duty to make the language of the parties serve their mutual intention, that the trial court received extrinsic evidence. Such evidence was freely received without objection by the parties or comment by the court, and this was proper. The contract being ambiguous, however, defendant was entitled to have such evidence considered by the court in its task of interpretation. The trial court did not do so, and we cannot say how it would resolve the conflicts in the evidence or what conclusions it would have reached upon considering such evidence. ■ If the extrinsic evidence had been weighed and considered by the trial court, the question of the meaning of the contract would have become one of fact. It is the province of the trial court to decide that question of fact. (*Walsh* v. *Walsh,* 18 Cal.2d 439, 444 [116 P.2d 62].)

No other points raised require discussion.

The judgment is affirmed as to the part thereof awarding plaintiff his final month's salary, in the amount of $1,500,

and reversed as to that part of the judgment which grants plaintiff the sum of $3,535.30 as additional salary based upon a percentage of the net profits of the named corporations. The cause is remanded to the court below with directions to render findings upon the subject of the parties' intent in employing the questioned contract language; if deemed necessary, to receive additional evidence upon the subject of such intent; and to enter a judgment based upon such findings. Appellant is to recover its costs.

Pierce, P. J., and Friedman, J., concurred.