[Civ. No. 30055. Second Dist., Div. One. Apr. 13, 1967.]

EDWARD L. ALPERSON, Plaintiff and Appellant, v. THE MIRISCH COMPANY, INC., Defendant and Respondent.

86

Kadison & Quinn, Stuart L. Kadison and Richard A. Roth for Plaintiff and Appellant.

Kaplan, Livingston, Goodwin & Berkowitz, Bayard F. Berman and Sol Rosenthal for Defendant and Respondent.

LILLIE, J.—The controversy herein resulting in a declaratory relief action arose out of different constructions given by the parties to certain written agreements dealing with the then proposed motion picture photoplay IRMA LA DOUCE. Plaintiff Alperson had negotiated with others for the acquisition of motion picture and television rights to the play; under the first agreement between the parties dated June 29, 1960, Mirisch contracted to pay Alperson therefor a sum equal to 25 percent of 100 percent of the net profits to be derived from the distribution and exploitation of the photoplay, it being specifically provided that Alperson's share of profits should not be reduced by any shares of profits paid by Mirisch to any third person. The agreement defined net profits as gross receipts (as defined in applicable distribution agreements) less the aggregate of distribution fees and expenses, interest on

production loans, other expenses not here material and "the cost of production of the picture." Included within the definition of production costs are "all sums paid pursuant to percentage of gross receipts agreements." In February of 1961 Mirisch entered into an agreement with Pyramid Productions (the interests thereunder were subsequently assigned to Phalanx Productions, Inc.) to produce the subject picture; both companies are either controlled or owned by Billy Wilder, a writer and director whose high standing in the industry is not questioned.

Under the agreement of February 1961, Mirisch obligated itself to pay Pyramid or Phalanx a share of the gross receipts derived from the distribution of the picture after such receipts had reached $10,600,000, defined as the artificial "break-point" and equal to twice the cost of the picture's production and other costs not here material. After this "break-point" had been reached, Pyramid or Phalanx became entitled to 17½ percent of the next $1,000,000 of gross receipts and 20 percent of all gross receipts thereafter.[1] The picture proved to be a tremendous financial success; thus, as of May 1, 1965 (approximately two months before trial) Wilder's companies (pursuant to the above arrangements) had received the sum of $1,226,404. Of this sum Alperson claimed 25 percent upon the theory that it represented shares of profits given to third persons within the prohibition of his agreement with Mirisch.

The over-all issue before the trial court was whether the monies thus paid, or thereafter payable, to Mr. Wilder's companies have been or should be deducted as "costs of production" in computing the net profits of the photoplay in which Alperson shares. If paid, or payable, pursuant to a percentage of gross receipts arrangement, Alperson had no interest therein. Finding in favor of Mirisch, the trial court drew the conclusion of law (No. 4) that "All of the sums heretofore paid and hereafter paid to Pyramid Productions, A.G., or its assignee, Phalanx Productions, Inc., under paragraph 10(f) (vi) of the Pyramid-Mirisch Agreement, are properly includible in the cost of production of the photoplay 'Irma La Douce' under paragraph 8(c) of the Alperson-Mirisch Agree-

---

[1]The *actual* break-even point of the picture (as distinguished from the artificial "break-point" in the Mirisch-Pyramid agreement) was reached at a gross of $12,177,000 or 2.4 (instead of twice) the negative cost. Pyramid thus shared in a percentage of the difference, approximately $1,500,000, before the picture actually broke even.

ment." It further concluded that Alperson take nothing by reason of his complaint. From the judgment Alperson appeals.

The conclusion of law hereinabove quoted having been predicated on a finding as to the meaning of the term "percentage of gross receipts arrangements," which language (as previously pointed out) is further definitive of "production costs," it is here contended by Alperson that the trial court, over his objection that the language was not ambiguous, erroneously admitted extrinsic evidence to clarify the meaning of such terminology, particularly with respect to its customary usage in the motion picture business. According to Alperson, the parties to the present contract sufficiently defined the terminology in issue and so particularized the meaning intended as to make unnecessary resort to custom and usage in aid of its construction. As a result, he argues, the custom and usage evidence supplied a special meaning found to be at variance with the special meaning agreed upon by the parties. It is urged that this violates the rule that "usage and custom will not be employed to vary the clear terms of an agreement or change their meaning when there is a specific contractual provision governing them." (*Edgar Rice Burroughs, Inc.* v. *Metro-Goldwyn-Mayer, Inc.*, 205 Cal.App.2d 441, 449 [23 Cal.Rptr. 14].) Additionally, he argues that the extrinsic evidence, even though erroneously received, does not support the several findings adopted below which are contrary to the construction of the term "percentage of gross receipts arrangements" contended for by him, namely, that such percentage starts with the first dollar of gross receipts. (The trial court found that, according to customary meaning and usage, the participant can start sharing in the gross receipts at any point negotiated by the parties, (1) from the first dollar of gross receipts or (2) at the point where sufficient gross receipts have been earned to equal a stipulated multiple of the production cost of the picture or (3) at the point where a certain stipulated dollar amount of gross receipts has been earned or (4) at some other formula-established point. Having been so negotiated, the Mirisch-Pyramid agreement is classifiable under (2), (3) or (4).)

■ Upon the trial so strongly did Alperson feel about the validity of his claim concerning the freedom of the terminology from any ambiguity, that he rested his case (without calling any witnesses) after the introduction of the two agreements above mentioned and one of the "applicable distribution agreements" likewise referred to above. Thereupon Mir-

isch made a motion for judgment under section 631.8, Code of Civil Procedure; it was denied by the court without prejudice to its renewal "if the plaintiff, being present, would testify as to what his meaning was of those items I mentioned," referring to the terminology here at issue. With the understanding that he was not waiving his claim that extrinsic evidence was unnecessary to any clarification of the language, Alperson testified to his understanding of its meaning, which included customary usage in the trade. We dispose of Mirisch's first point that by so testifying, Alperson waived or became estopped to object to the introduction of extrinsic evidence at variance therewith by Mirisch. Relied upon by Mirisch is *Mc-Keon* v. *Santa Claus of Cal., Inc.*, 230 Cal.App.2d 359, 363 [41 Cal.Rptr. 43], which holds that when parties on cross-examination have "opened the door to the admission of the parol evidence," they cannot later complain that such evidence should not have been admitted. On its facts, *McKeon* does not here govern; more applicable and controlling is *People* v. *Lagiss*, 160 Cal.App.2d 28 [324 P.2d 926], a condemnation proceeding, wherein cases are cited for the proposition that no waiver of error results from defensive or precautionary action which is taken in response to an assertedly erroneous ruling. In the present case, the trial judge had the record indicate that "I am asking for additional evidence." Under all of the circumstances, we do not believe that Alperson should be foreclosed from appellate consideration of a contention that goes to the very heart of the controversy. Nor should our holding be otherwise because, as Mirisch additionally asserts, rebuttal witnesses (three in number) were called by Alperson to negate custom and usage testimony introduced by his adversary. The *Lagiss* decision definitely holds (p. 35) that a party, without waiving objections previously made, may offer rebuttal on an issue in response to evidence admitted over objection.

In support of his claim that the subject language was unambiguous, Alperson contends that the term "gross receipts" is sufficiently defined in paragraph 8 of the Mirisch-Alperson agreement by reference to the "applicable distribution agreements"; specifically, by virtue of paragraph 22 of one such agreement dated May 1, 1961, "gross receipts" is deemed to be ". . . all monies or other things of value derived by United [Artists] and its subsidiaries from the lease, license, rental, dealing in, and distribution of the rights in or in connection with the Picture. . . ." According to Alperson, only

one meaning can be derived from the above definition, namely, that "gross receipts" start from the first dollar of revenue in the hands of the distributor, and since Pyramid did not share until the 10,600,000th dollar, its arrangement with Mirisch was not a "percentage of gross receipts arrangement." Too, he argues that the subject having been accorded a clear contractual definition, the case is governed by the rule followed in *Edgar Rice Burroughs, Inc.* v. *Metro-Goldwyn-Mayer, Inc.*, *supra*, 205 Cal.App.2d 441, 449, and the further principle mentioned in *Ermolieff* v. *R.K.O. Radio Pictures*, 19 Cal.2d 543, 550 [122 P.2d 3], that where the terms of the contract are expressly and directly contrary to the precise matters embraced in the custom or usage, parol evidence of that custom or usage is not admissible: "The provision in the contract was tantamount to a clause that custom or usage shall not be a part of the contract." (P. 551, citing *New York Central R.R. Co.* v. *Frank H. Buck Co.*, 2 Cal.2d 384 [41 P.2d 547].)

The facts of this case do not call for the application of the rule or principle upon which Alperson relies. In the first place, "gross receipts" is not the only term material to a determination of the relief sought; it must be read or correlated with the terms "percentage of gross receipts arrangements," "costs of production" and "net profits," all of which are found (with "gross receipts") in paragraph 8 of the Mirisch-Alperson agreement. As stated in *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 760 [128 P.2d 665], even if one provision of a contract is clear and explicit, it does not follow that that portion alone must govern its interpretation; the whole of the contract must be taken together so as to give effect to every part. (Civ. Code, § 1641.) Clause (c) of paragraph 8 provides that the cost of production, one of the items of deductible expenses, "shall include all items of cost treated as costs of production of motion pictures or television series *in accordance with independent motion picture or television practices.*" (Italics added); continuing, "No sums paid pursuant to participation in net profits shall be treated as a cost of production . . .''; and the clause concludes with this provision: "All sums paid pursuant to percentage of gross receipts arrangement shall constitute and be treated as part of the costs of production of the picture." All of these provisions in combination add up to the following proposition: If an expenditure by Mirisch in the course of producing the picture is generally treated as a production cost in accordance with independent motion pic-

ture practices, it is deductible from gross receipts; the only sum not deductible is one paid pursuant to participation in net profits. Stated otherwise, an item does not constitute net profit if it represents a cost of production conforming to customary motion picture practice. Clearly, therefore, the existence of net profit cannot be ascertained or eliminated without first determining whether the production cost, claimed to be deductible, accorded with custom and usage in the industry.[2]

The terms are technical ones, and there was a lack of complete unanimity even among the various expert witnesses as to their meaning. Moreover, both parties to the contract had a long experience in the motion picture industry as producers and were fully conversant with its customs and usages. It hardly seems reasonable that provision would have been made for custom and usage to construe the meaning of terminology if, as Alperson insists, such language was free from ambiguity or, as asserted, "crystal clear." In this latter respect, Alperson argues that the test of ambiguity is not a subjective one to be measured by the capacity of the trial judge to understand the meaning of the terminology contracted for. ■ Perhaps so, but it has been declared that "Unless a court can 'to a certainty and with sureness, by a mere reading of the document, determine which is the correct interpretation . . . extrinsic evidence becomes admissible as an aid to interpretation. . . .' [Citation.]" (*Bartel* v. *Associated Dental Supply Co.*, 114 Cal.App.2d 750, 752 [251 P.2d 16].)[3]

■ Disagreeing with the assertion that the case at bar is unlike any reported case found in that custom and usage testimony has substituted a special meaning at variance with the special meaning agreed upon, we hold that it is controlled by *Ermolieff* v. *R.K.O. Radio Pictures, supra,* 19 Cal.2d 543, which distinguished an earlier case (*New York Central R.R. Co.* v. *Frank H. Buck Co., supra,* 2 Cal.2d 384) relied on by Alperson: "The correct rule with reference to the admissibility of evidence as to trade usage under the circumstances

---

[2]Other courts have struggled with the meaning of the term "net profits," holding it to be ambiguous unless correlated with other language in the agreement. For example, see *Wechsler* v. *Capitol Trailer Sales, Inc.,* 220 Cal.App.2d 252, 263-264 [33 Cal.Rptr. 680]; *Sweeney* v. *Earle C. Anthony, Inc.,* 128 Cal.App.2d 232, 234-236 [275 P.2d 56].

[3]Contrary to Alperson's contention that such a determination should have been made, it is of no consequence that the trial court made no express finding of ambiguity. In *Schmidt* v. *Macco Construction Co.,* 119 Cal.App.2d 717 [260 P.2d 230], a similar claim was thus disposed of: "When the trial court, over objection, ruled that the evidence was admissible it necessarily ruled that the contract was ambiguous." (P. 730.)

here presented is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, yet if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are deemed to have used them to their different and peculiar sense as shown by such trade usage. Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, inasmuch as by reason of the usage the words are used by the parties in a different sense." (P. 550.) As the title of the cause indicates, *Ermolieff* dealt with the motion picture industry—more specifically, the exclusive right to produce and distribute the subject picture in certain countries as specified in the contract. The court having there at least impliedly determined that the movie industry was a specialized business, the following from a later case is also pertinent to the point presently under discussion: "But even if to a layman the phrase [building into concrete] were clear and unambiguous, we are here dealing with a contract relating to the building industry, a specialized business, and it appears that the phrase in question has acquired a specialized and definite meaning to those in that business. This being so, the parol evidence was admissible to explain that specialized meaning." (*Associated Lathing etc. Co.* v. *Louis C. Dunn, Inc.*, 135 Cal.App.2d 40, 47 [286 P.2d 825].) Many other decisions (some of which are cited in *Associated Lathing*) adhere to the general rule, to which this proceeding is no exception, that evidence of custom and usage is permissible without a showing of ambiguity in the strict sense contended for by Alperson. This last observation is made in light of his claim that the phrase "gross receipts" is so "crystal clear" that resort to usage and custom is thereby negated, with which we cannot agree since, as hereinabove pointed up, the term must be read with other portions of paragraph 8 bearing upon the matters in dispute. Finally, it should be noted that Alperson agrees generally with *Ermolieff* and other decisions relied on for an affirmance; his quarrel is with the application of the result reached in *Ermolieff*, rather than the exception therein referred to but not applied to the facts at bar.

The next main issue is a challenge to the sufficiency of the evidence to sustain the findings and judgment. Under familiar rules our task is to decide whether such evidence,

viewed in the light most favorable to the prevailing party, is of sufficient substantiality to support the challenged determination; in so doing, of course, all conflicts must be resolved in favor of the judgment. Governed by such established principles, we have little hesitancy in rejecting Alperson's claim that the evidence, including that relating to custom and usage, makes it clear that the arrangement contemplated by the parties starts with the first dollar of gross receipts as assertedly defined in the parties' agreement. Seven witnesses were called by Mirisch, and three by Alperson (who also testified); in no instance were their qualifications challenged and accordingly, it is not our function to weigh the pros and cons of their respective professional conclusions. The testimony of each has been summarized in the briefs and examined *in toto* by this court. As we view the totality of such evidence, the only area in which there was any disagreement relates to the point in time when the gross participating interest attached. All agreed that the gross participant, when he commences sharing in the gross receipts, shares in the money received from the distributor "off the top." Alperson's witnesses, however, could not subscribe to the view shared by Mirisch's experts that so long as the participant shares "off the top," a participating interest retains its "gross" character regardless of the point in time it attaches so long as such point is established by some negotiated formula.

We do not propose (as the parties have done) to discuss the testimony of each and every one of these experts. ▆ It is the rule, having been once again enunciated in *Francis* v. *City & County of San Francisco*, 44 Cal.2d 335, 340 [282 P.2d 496], that the testimony of one witness, if believed by the trier of fact and if not inherently improbable, is sufficient to sustain a finding. ▆ The evidence given by Herman Citron, the first witness called by Mirisch, certainly belongs in the credible category.[4] A theatrical agent of over 30 years, he testified to his familiarity with, and negotiation of, employment agreements and arrangements for actors, producers and directors, including arrangements measured by gross as well as net profits. After stating that the term "percentage of gross receipts arrangement" had a customary meaning in the industry, he defined it as " [that point] where the participant would start to collect moneys that had been contracted for";

---

[4] Alperson's counsel paid him the compliment of being "probably the best agent in the business" and "a highly qualified gentleman."

that a gross participant shares in all the money that reaches the distributor, "off the top," after his share attaches; and that there can be a "percentage gross deal made after a format, using, let's say, double negative cost," thereafter illustrating by an example similar to that found in the Mirisch-Pyramid agreement. The witness also explained the difference between a gross participant and a participant in net profits: The former's share penetrates all the monies received without any deductions, whereas the latter shares only after the deduction of distribution fees and expenses and other costs. Mr. Citron's opinions in the above respects were adopted substantially by the trial court.

Opinions, generally corroborative of Mr. Citron's views, were given by the vice-president of a major picture studio, an executive at another major studio, two attorneys specializing in entertainment law and a certified public accountant familiar with the customs and practices in the independent motion picture business. As was Mr. Citron, all were extensively cross-examined, and it is argued by Alperson that such cross-examination merits his criticism of the value attachable to the witnesses' opinions. Such criticism, however, goes to the weight of the challenged testimony and not to its substantiality for the purposes of appeal.

Alperson, in turn, as stated above, called three experts by way of rebuttal. All disagreed with Mirisch's witnesses in the respects already noted. But during the cross-examination of one of the three, Deane Johnson, the head of the entertainment section of a leading Los Angeles law firm, the following significant testimony emerged: While maintaining on direct examination that the Mirisch-Pyramid agreement was not a "percentage of gross receipts arrangement" in that it was an arrangement for profit sharing, under cross-examination he conceded that it was not a "pure profit participation" since there were all kinds of gross receipts arrangements falling between. He further testified (on cross-examination) that frequently a number of variables can cause the break-even point to vary considerably from what the artist and producer might expect at the time the artificial "break-point" was negotiated; this is particularly true, he added, when production has not proceeded beyond a mere basic story. If that be so, since it appears that nothing had been done to produce the subject picture when the Mirisch-Alperson agreement was made, it seems quite unlikely that the parties could have evolved a profit sharing arrangement, in light of Mr. John-

son's testimony, when they were confronted with the variables governing the point when the picture would be "in the black."

Recapitulating, we find evidence of more than sufficient substantiality to sustain the findings and judgment. Any contrary testimony or inferences deducible therefrom or conflicts inherent in the Mirisch testimony must be disregarded in view of that determination. Indeed, it can also be stated that the evidence preponderated in favor of Mirisch even though the burden of proof was on Alperson to show (among other things) that the payments made to Wilder's companies were not deductible—and this Alperson concedes he has not done.

There are other minor contentions which we deem without merit, but we make mention of one final point. Alperson argues that we are not bound by the construction of the Mirisch-Alperson agreement by the court below, citing *Parsons* v. *Bristol Development Co.*, 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839]. But that case holds that " 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' " (P. 865.) That, of course, is not the situation at bar. ▉ To the contrary, the true rule governing here is that where extrinsic evidence has been admitted, and it is in conflict, any reasonable construction below will be sustained. (*Collins* v. *Home Savings & Loan Assn.*, 205 Cal.App.2d 86, 101 [22 Cal.Rptr. 817].)

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 7, 1967.