[Civ. No. 32132.   Second Dist., Div. One.   June 26, 1968.]

UNITED STATES LIABILITY INSURANCE COMPANY, Plaintiff and Appellant, v. HAIDINGER-HAYES, INC., Defendant and Respondent.

532

David C. Bogert, Long & Levit and Rose & Ehrmann for Plaintiff and Appellant.

Frank Fullenwider and Joseph F. Rank for Defendant and Respondent.

LILLIE, J.—Effective April 1, 1959, plaintiff insurance company and defendant corporation, an insurance general agent and surplus line broker, entered into a written agency contract which, in paragraph (8) thereof, provided for a profit-and-loss sharing formula. Five years later, in March of 1964, plaintiff instituted the present action, asserting that there was a loss on the business written for it by defendant and, pursuant to the above formula, asking reimbursement to the extent of one-half of such loss. Denying the above claim, defendant alleged by various counterclaims that under the formula the business had produced a profit and prayed for judgment in an amount due it under the agreement and an amendment thereto. The court denied plaintiff recovery and upheld certain of defendant's counterclaims. Plaintiff appeals from the judgment.

Paragraph (8), setting forth the formula, reads as follows: "(8) The commission to be paid to the Agent is to be 20%, and subject to the following formula:

```
"Premium  ......................... $100.00
 Commission .......................   20.00
                                    _____
 Net Premium ......................  $ 80.00
 Company agrees to retain 10% of net
   premium for overhead and state taxes  8.00
                                    _____
 Available for loss* ..............  $ 72.00
```

*Including all allocated expense, legal, loss payment and any other expense mutually agreed to be incurred to minimize loss under this agreement.

"It is understood and agreed that any redundancy between actual losses paid and 72% shall be equally divided between the company and the Agent. It is also understood and agreed

that if the ratio of 72% of the premium is not adequate to pay loss, the Agent agrees to pay the company 50% of such differences, subject to a maximum payment of 20% of the full premium.

"It is agreed by both parties that records shall be maintained on an annual basis, and the above formula shall apply to each twelve-month period of runoff, with adjustment being made six months after the annual period as would appear prudent, considering the company's position on loss reserves, but final adjustment will be subject to a waiting period of three years following the close of one-year's written business."

The court found that: "loss reserves" constitute reserves established by the company for claims which have not been paid, and for which claims have been paid, but which have loss expenses still outstanding, and include reserves for payment of actual losses and anticipated loss expense such as investigation, legal and expenses to minimize loss; "actual losses paid" are the amount paid for losses which have occurred on policies coming under said contract and include allocated loss expense but not loss reserves; "losses incurred" represent the amount of losses paid and outstanding (including "loss reserves") for which the insurer has become or expects to become liable. In light of these definitions the trial court further found, after declaring the paragraph to be "clear and unambiguous," that under the formula "final adjustment as to each year's written business was to be made between the parties at the end of three years following the close of that year's written business, and that said final adjustment was to be on the basis of actual losses paid during the year in which the business was written and the three calendar years immediately thereafter and not including reserves at the end of said three-year period." Plaintiff challenges the above finding asserting that it is the central issue at bar; for if, as contended by it, consideration had properly been given to loss reserves in determining whether the parties' business arrangement produced a profit or loss, defendant would have recovered nothing on its counterclaims (totalling in excess of $115,000) and plaintiff would have been entitled to a judgment approximating $300,000. Plaintiff contends that the challenged finding does violence to the so-called "economic realities" of everyday

insurance life, which claim assertedly is illustrated by the example set forth below.[1]

In its criticism of the challenged finding, plaintiff invokes certain principles as here applicable—first, the lower court's determination with respect to the unambiguity of paragraph (8) is not binding on this court; second, where there is no conflict in the extrinsic evidence produced in aid of doubtful terminology found in the instrument, the appellate court must make an independent determination of the writing being interpreted; third, in the construction of a writing, words which are inconsistent with the main intention of the instrument should be disregarded (Civ. Code, § 1653)—the so-called "main apparent purpose" rule; and fourth, the conduct of the parties subsequent to the contract's execution should be accorded great weight in construing its terms. The relevance of the above rules, all of which are not without certain limitations, is dependent upon the record of the proceedings in the court below.

At the outset of the trial, plaintiff first elected to stand upon the contract, contending that its terms were clear and unambiguous and favored plaintiff's interpretation of its main purpose; it did so after briefly questioning Mr. Haidinger. Defendant, claiming that the instrument unambiguously supported a contrary construction, then moved for a judgment of nonsuit. The motion was denied without prejudice, the court setting certain "ground rules" for the further conduct of the trial.[2] Mr. Haidinger was then recalled; testi-

[1] Under defendant's theory of the case, a final judgment in the amount of $1,000,000 on a claim under a 1959 policy would be disregarded if the judgment had not been actually paid within the three-year period. Thu·, if losses and expenses actually paid during the base period and the thre· years following were $200,000 less than the earned premiums on the 1959 business, defendant would contend that the 1959 business resulted in a profit of $200,000 and that it is entitled to $100,000, even though of a certainty the 1959 business will eventually develop a loss of at least $800,000.

[2] "It will be denied without prejudice to its reassertion or assertion of alternative motions at such time as plaintiff does conclude its presentation which I shall call supplemental presentation on the issue of the validity of the contract or the status of the contract, that is, is it an ambiguous or non-ambiguous instrument that the Court can interpret as a matter of law. If it interprets it one way, namely, there is a cut-off period of one year plus three years, the damages are non-existent according to the stipulated exhibits. If it rules the other way and holds that it is sort of an open-end arrangement that losses can be shown after the one-year plus three-year period, we would have to take evidence on it.

"So borrowing an expression that is sometimes used and more often used, we are going to have a bifurcated trial, one on the issue of the con-

mony was also taken (on plaintiff's behalf) from Mr. Berry, plaintiff's president, and Mr. Reilly, its secretary. Except for cross-examination of Mr. Berry and Mr. Reilly, defendant rested its case as to the first portion of the bifurcated trial without the introduction of additional testimony. Counsel then argued the facts and the law; upon submission of the matter the court ruled in defendant's favor on the issue of the construction to be given the contract in suit. Evidence was then received respecting the amounts recoverable under the instrument. Plaintiff seemingly does not question the correctness of the sums finally determined to be due on defendant's counterclaims; instead, as indicated at the outset, it contends that under the contract, if properly interpreted, defendant would have been entitled to nothing and judgment should have been rendered in plaintiff's favor as prayed.

Since much of the extrinsic evidence forthcoming from the three witnesses called went to the question of the meaning of the terminology used, we have little hesitancy in stating that the first two principles hereinabove relied on by plaintiff have no application to the case at bar. ■ Preliminarily, "all intendments are in favor of the judgment and this court must accept as true the evidence which tends to establish the correctness of the findings as made, taking into account as well all inferences which might reasonably have been drawn by the trial court. The test, of course, is not whether there is a substantial conflict in the evidence but whether there is substantial evidence in favor of the respondent. [Citations.]" (*Crogan* v. *Metz*, 47 Cal.2d 398, 403-404 [303 P.2d 1029]); conversely, under the holding in *Estate of Teel*, 25 Cal.2d 520, 527 [154 P.2d 384], cited in *Crogan*, "[evidence] unfavorable [must be] discarded as not having sufficient verity, to be accepted by the trier of fact." Too, while the court found (No. 11) that "Paragraph 8 . . . is clear and unambiguous" as to certain provisions therein referred to, it did so after reference in the preceding finding (No. 10) to conversations (as well as correspondence) between the parties elicited in the form of extrinsic evidence which, as indicated above (fn. 2),

---

tract as to the meaning of the term 'final adjustment' particularly, and dependent upon that we will or will not proceed with the issue of damages.

"Do I make myself clear?"

"Mr. Bogert: Yes your Honor.

"The Court: The motion to reopen to present evidence is granted, and therefore the motion for non-suit at this time is premature. That is denied without prejudice.

"You may proceed."

was forthcoming with the apparent approval of plaintiff's counsel. Accordingly, the situation is different from that found in *Wechsler* v. *Capitol Trailer Sales, Inc.*, 220 Cal.App. 2d 252, [33 Cal.Rptr. 680], relied on by plaintiff for the claim that the determination below is not binding here, since in that case "the trial judge, after analyzing the language of the contract and outlining the reasoning which led to his conclusion, rejected any consideration of the extrinsic evidence. . . ." (P. 263.) █ Furthermore, extrinsic evidence having thus been received, any reasonable construction of the instrument by the trial court must be sustained if the evidence so admitted is in conflict. (*Alperson* v. *Mirisch Co.*, 250 Cal.App.2d 84, 90 [58 Cal.Rptr. 178].) Indeed, plaintiff concedes that paragraph 8 "may possibly also be capable of two different reasonable interpretations." (A.O.B. p. 10), the first of these interpretations (curiously enough) being that adopted by the trial court. While such concession, rather understandably, is accompanied by the assertion that there was no conflict in the evidence as to pertinent matters, we cannot accept this one-sided approach to the problem in light of *Crogan* and *Teel* which require us to view the evidence and the inferences reasonably deducible therefrom which favor defendant's side of the controversy.

So viewed, it seems that the provision for defendant's remuneration was unusual in that any commissions paid would be either refunded in whole or in part or augmented; as stated in the agreement, such refund or augmentation, as the case might be, depended upon the relationship between the premiums written and the losses actually paid on insurance business placed by defendant with its principal (plaintiff).[3] The above unusual features of the agreement are explainable by the financial positions of the parties prior to the instrument's execution. In December of 1958 plaintiff had a policyholders' surplus of $1,289,193, while its total admitted assets were treble such surplus—$3,122,078. Defendant, on the other hand. at that time had a large amount of business (an annual premium volume of $5,000,000) but relatively limited assets

---

[3]By way of contrast, at or about the same time the parties entered into an agency agreement covering the subject of fire insurance. The basic commission therein called for was 25 percent (as contrasted with 20 percent under the agreement here in suit, half of which [12½ percent] was admittedly paid to local agents), and there is no provision for the refund of any part thereof. Too, the fire insurance agreement also allowed the agent 15 percent of the company's earnings.

($56,053.49). Mr. Haidinger explained this disparity to Mr. Berry during negotiations prior to the consummation of the agreement, explaining why he would have to have a three-year cutoff. Hence, defendant makes the plausible argument (which was accepted by the trial court) that because of his relatively weak financial business, Mr. Haidinger bargained for and obtained the crucial provision which called for a final adjustment including losses actually paid during the year in which the business was written and the three years thereafter (the three-year cutoff), and excluding reserves which customarily are set at approximately 10 percent above what the anticipated loss would be. Too, it seems practically a matter of common knowledge that the average claim is not settled immediately after presentation, and frequently the date of payment (in lieu of settlement) is further postponed in the event of litigation. Wholly implausible, on the other hand, is plaintiff's argument sought to be illustrated by the example (fn. 1) involving the filing of $1,000,000 claim; this is so since the subject contract had a limit of $25,000 on any one coverage and hence the parties never anticipated a single loss exceeding such limit.

█ We come now to the third principle or rule upon which plaintiff relies, namely, that the conduct of the parties subsequent to the agreement's execution should be considered in interpreting the parties' understanding of their respective commitments. The rule is thus stated in 1 Witkin, Summary Cal. Law (7th ed. 1960) p. 249: "Acts of the parties, subsequent to the execution of the contract and before any controversy has arisen as to its effect, may be looked to in determining the meaning. The conduct of the parties may be, in effect, a *practical construction* thereof, for they are probably least likely to be mistaken as to the intent." The above rule, however, is subject to the following limitation: "In determining the meaning of an ambiguous contract the interpretation placed on the contract by the parties themselves may be considered only when the acts of the parties were positive and deliberate and done in attempted compliance with the terms of the agreement." (12 Cal.Jur.2d, Contracts, § 130, p. 343.) █ It appears that numerous demands were made by plaintiff on defendant for payment of the share of losses chargeable to the latter; many were accompanied by statements after January 1, 1963 (the expiration date of the three-year waiting period on the 1959 business). According to

plaintiff, no objection was ever made by defendant to the inclusion of loss reserves in such statements even though it may have objected to the correctness of the sums set forth. But again we are faced with the admonition that unfavorable evidence should be discarded if it conflicts with that favoring the prevailing party below. The contention here was disposed of by the following finding (No. 10) which is substantially supported and therefore conclusive: ". . . . In engaging in such correspondence and conversations, defendant was not engaging in a practical interpretation of the contract under which loss reserves were to be considered in the final adjustment, nor was defendant engaging in a course of conduct which should estop him from asserting in this proceeding his position that loss reserves were not included in any final adjustment under paragraph 8 of said contract. . . ."

▓ As in the case of the rule just discussed, so also is the "main purpose" rule, statutorily defined, subject to similar limitations. The statutes relied on by plaintiff, Civil Code, section 1650, as well as section 1653, must be read with section 1641 which provides that "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (See *Harris* v. *Klure*, 205 Cal.App.2d 574, 577-578 [23 Cal.Rptr. 313].) ▓ Without citing any cases, plaintiff urges that the main purpose of the contract was a sharing of profits and losses. We do not agree. When all of its clauses are read together, it seems that the instrument's main purpose was to establish a satisfactory principal-and-agent relationship; hence, phrases which do relate to sharing profits and losses must be viewed in the light of what will be a profitable remuneration of the agent. We perceive no substance to the claim that the instant statutory rules of construction were not complied with.

▓ This brings us to the only other assignment of error which is argued—and this but briefly. Appellant states that the court erroneously sustained objections to the admission of two letters from Mr. Haidinger indicating his state of mind on certain aspects of the case. It is not contended that the court's ruling constituted reversible error; nor could such contention be validly advanced since the letters would have called for the production of evidence cumulative in nature which the trial court, in its discretion, was empowered to exclude. (*Fuentes* v. *Tucker,* 31 Cal.2d 1, 7 [187 P.2d 752].)

■ For a final assignment of error, it is asserted (with no supporting argument or authority) that certain of the findings of fact and all the conclusions of law drawn therefrom are erroneous. A point thus raised requires no discussion since it will be deemed to be without substantial foundation. (*In re Steiner*, 134 Cal.App.2d 391, 399 [285 P.2d 972].)

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 21, 1968.