[Civ. No. 25668. First Dist., Div. Two. Feb. 10, 1970.]

MARVIN H. GROVE, Plaintiff, Cross-defendant and Appellant, v. GROVE VALVE AND REGULATOR COMPANY et al., Defendants, Cross-complainants and Appellants.

300

## COUNSEL

Fitzgerald, Abbott & Beardsley, Andrews, Kurth, Campbell & Jones and Paul E. Harris for Plaintiff, Cross-defendant and Appellant.

McCutchen, Doyle, Brown & Enersen, John N. Hauser, Richard Murray and Melvin R. Stidham for Defendants, Cross-complainants and Appellants.

## OPINION

**DAVID, J. pro tem.**[*]—This is a suit brought by appellant Marvin H. Grove for injunctive relief and accounting against respondents Grove Valve and Regulator Company and Walworth Company, for use of 12 improvement inventions patented to and allegedly made by him, in the manufacture and sale of the so-called G-5 gate valve, and Valv-Pak completion valve assembly. Respondent companies cross-complained, asserting their ownership of the 12 patents, and 6 more inventions patented to Mr. Grove, by reason

---

[*]Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

of their contract or contracts with appellant Grove; and sought mandatory injunctive relief to compel him to transfer these patents to them.

After 29 trial days, over 3,000 pages of testimony and consideration of 285 exhibits, the trial court ruled that respondents did indeed own all 18 patents in dispute; and granted the injunctive relief sought by respondents; but as a condition of formal transfer of the domestic and derivative foreign patents to them by appellant, required that respondents reimburse him in the sum of $64,814.99, expenses found to have been incurred reasonably in securing and maintaining the patents in his name up to time of trial.

Grove appeals from the judgment decreeing that respondents own the patents; and respondents cross-appeal from the requirement that they pay such expenses.

### History of the Relationships

Appellant Marvin H. Grove founded the Grove Regulator Company (later renamed the Grove Valve and Regulator Company) in 1935. Its stock was held in trust for members of the Grove family. In 1956, by a share for share exchange, the Grove Valve and Regulator Company, and Grove Controls (another family entity) were merged with respondent Walworth Company. Appellant became a director of Walworth and a member of its executive committee.

As an apparently prolific inventor and manager, appellant Grove was employed by the new regime under a contract dated October 16, 1956. Paragraph 3 of this agreement provided that all inventions, improvements or discoveries conceived or made during the period of plaintiff's employment by the two companies and "which relate to or have application to the valve, fluid control or regulator business shall be the sole and exclusive property of the two Companies. . . ."

On January 21, 1959, plaintiff entered into a new employment agreement with Grove Valve & Regulator Company back-dated to January 1, 1958. This contract, in a new paragraph 3, provided as follows: "It is anticipated that during the term of his employment, and for a period of two (2) years thereafter, GROVE may acquire or conceive various inventions, improvements or discoveries. *Insofar as such inventions, improvements or discoveries are improvements to valves utilizing resilient O-rings to seal their valve members against line pressure, the same shall be the sole and exclusive property of the* GROVE COMPANY *and/or* WALWORTH COMPANY, and GROVE agrees to assign the same to the GROVE COMPANY and/or to WALWORTH COMPANY, together with all United States and foreign Letters Patent and applications thereon." (Italics added.) Grove and his wife already owned the patent on the resilient O-rings on which they received royalties from the company, and still do.

Paragraph 5 of this agreement provided that "All inventions, improvements or discoveries *other than as defined in Paragraph 3 hereof,* which GROVE may conceive, make or acquire, shall belong to him." (Italics added.) Paragraph 9 restrained Grove from competitive business or employment.

On July 1, 1959, at a meeting of the Walworth board of directors in New York, Mr. Grove, through his counsel, Mr. Flehr, formally asserted that he had made certain new inventions incorporated into products referred to as G-5 and Valv-Pak, and proposed that Walworth enter into new agreements with him, whereby he should be paid royalties for the manufacture of the products by Grove Company; with both the valve products G-5 and Valv-Pak "being designed to use the Seal-O-Ring feature to facilitate trade acceptance."

This use of Seal-O-Ring in the proposed G-5 and Valv-Pak prima facie fell within company ownership as provided by paragraph 3 of the 1959 and 1956 agreements. It was represented, contrary to later expert testimony, that the improved devices could be used without the Seal-O-Ring and that as to G-5 and Valv-Pak, the O-Ring was only a "sales gimmick." Hence it was urged to the directors by appellant's counsel that this was a situation falling into paragraph 10; or was an in-between situation not clearly covered by paragraphs 3 and 10 at all; and that therefore Mr. Grove should be given an appropriate royalty. As already noted he and his wife derived royalties from the Seal-O-Ring resilient valve ring.

The minutes of a directors' meeting indicate that after extended discussion, the directors "approved in principle the proposals and that the appropriate agreements should be negotiated with Mr. Grove by the Executive Committee and submitted to the Board for approval."

Negotiations then proceeded between the Executive Committee and Mr. Grove, who was represented by Mr. Flehr.[1] Mr. Pokross, counsel for Walworth, objected to the schedule of royalties proposed by Mr. Grove. Mr. Grove succeeded in getting Mr. Pokross removed from the board of directors of Walworth Company at a meeting on April 27, 1960.

On May 10, 1960, by a letter and memorandum to each member of the board of directors, Mr. Pokross suggested to the board that an investigation

---

[1]Mr. Flehr wore many hats: (a) vice president and patent counsel for Grove Company; (b) counsel for Mr. Grove personally; (c) trustee of the Grove family stock; (d) director of the Walworth Company. Mr. Flehr was enjoined and restrained from acting as attorney for Marvin Grove in this action by an order signed by Judge Caldecott, which order was affirmed on appeal, Agee, J., writing the opinion: *Grove v. Grove Valve & Regulator Co.* (1963) 213 Cal.App.2d 646 [29 Cal.Rptr. 150], hearing denied by the Supreme Court.

be made into Mr. Grove's representations that the patents were owned by him. He asserted the possibility that the discoveries were already the property of the Grove Company and Walworth by reason of the 1956 and 1959 employment agreements with Mr. Grove. He inferred that perhaps plaintiff had violated his fiduciary duty to Walworth and Grove Company in failing to make full disclosure that these inventions were already the property of the company. Grove was an officer of Grove Valve and Regulator Company (its president) and a member of the board of directors of Walworth since 1957. In June 1960 Grove resigned from the board of directors and in October 1960 brought this action.

Until the May 1960 communication, no Walworth director suspected that appellant's assertions of ownership of the patents might be false or questionable.

The trial court determined that the respondents were indeed the owners of the inventions under the terms of the 1959 agreement, finding that: "Each and all of the G-5 and Valv-Pak inventions were and are improvements to valves utilizing resilient O-rings to seal their valve members against line pressure *within the meaning and intent of paragraph 3 of the 1959 Agreement.*"[2] (Italics added.)

With such a finding, appellant was held not to be entitled to the injunctive relief nor to the damages claimed.

I. *The findings of fact made by the trial court are conclusive upon this appeal.*

(a) *Findings of the court.*

Upon trial, Mr. Grove asserted that in its application to the instant controversy, paragraph 3 of the 1959 agreement was ambiguous, and put forward several possible constructions of its language.

Having properly admitted extrinsic evidence to aid in its interpretation, it was the function of the trial court to resolve all conflicts and make findings thereon. (*Paramount Television Productions, Inc.* v. *Bill Derman Productions* (1968) 258 Cal.App.2d 1, 11 [65 Cal.Rptr. 473].) Thus, the court made findings Nos. 8 and 12:

"8. With respect to improvements made by the plaintiff during the term

---

[2]Paragraph 3 of the 1959 agreement provides: "Insofar as such inventions, improvements or discoveries are *improvements to valves utilizing resilient O-rings to seal their valve members against line pressure,* the same shall be the sole and exclusive property of the GROVE COMPANY and/or WALWORTH COMPANY." (Italics added.)

of his employment and for two years thereafter, it was the intention of the parties, by paragraph 3 of the 1959 Agreement, to give defendants ownership of improvements of any kind to valves which actually utilize resilient O-rings to seal their valve members against line pressure, and to use the word 'utilizing' to modify 'valves', not 'improvements', and to refer all valves actually utilizing O-ring seals, rather than being restricted to valves in which *only* O-ring seals could be used."

"12. Each and all of the G-5 and Valv-Pak inventions were and are improvements to valves utilizing resilient O-rings to seal their valve members against line pressure within the meaning and intent of pragraph 3 of the 1959 Agreement."

No other type of seal was ever considered by appellant in development of G-5 and Valv-Pak, according to the evidence and these valves were expressly designed to use them.

Thus, under the findings of the trial court these patents and improvements already belonged to respondents under the 1956 and 1959 agreements.

██ All intendments are in favor of the judgment. This court must accept as true the evidence which tends to establish the correctness of the findings as made (*Crogan* v. *Metz,* 47 Cal.2d 398, 403-404 [303 P.2d 1029]; *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1968) 263 Cal.App. 2d 531, 536 [69 Cal.Rptr. 373]).

██ Appellant cannot point to any absence of substantial evidence to support these findings, and has not attempted to do so on this appeal. Accordingly, we do not accept the invitation to redetermine these issues of fact. (*Bones* v. *Fusco* (1937) 21 Cal.App.2d 476, 478 [69 P.2d 911]; *Prudential Ins. Co.* v. *Fromberg* (1966) 240 Cal.App.2d 185, 189 [49 Cal.Rptr. 475]; *Massachusetts Bonding etc. Co.* v. *Osborne* (1965) 233 Cal.App.2d 648 [43 Cal.Rptr. 761].)

It is asserted that such findings are invalid as a matter of law because the court did not follow an allegedly paramount practical construction of the 1959 agreement.

(b) *The conduct of the parties after 1959, and particularly during the 1960 negotiations was not controlling in ascertaining their intention as to paragraph 3 of the 1959 contract.*

Appellant, however, urges that during the nine months of negotiations: (1) the respondents in assuming and acting upon the premise of Grove's ownership gave the preceding contracts a practical construction, affirming Grove's ownership of the patents, which should be paramount; (2) in anticipation of a fully executed license, respondents authorized the expenditure

of funds for the new machinery and tools which would be required to manufacture the two new products and thereafter made and sold the G-5 and Valv-Pak products; (3) likewise respondents exhibited models of the G-5 valve at an oil show in Tulsa in May 1959.

On the other hand, the recitals of the proposed master foreign contract, while indicating the right of Grove and the companies to negotiate, expressly stated that neither its provisions nor the acts of the parties should be considered an interpretation or modification of the employment agreement.

█ Though a "practical construction" is properly considered in determining the intent of the contracting parties, it does not preempt all other considerations. The court, in construing the contract, must look to all relevant circumstances. (*Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38-39 [69 Cal.Rptr. 561, 442 P.2d 641]; *Lemm* v. *Stillwater Land & Cattle Co.* (1933) 217 Cal. 474, 481 [19 P.2d 785].)

█ The transcript here shows that it did. The trial court was authorized to disregard the "practical construction" in favor of more satisfactory evidence. (*Riverside Heights etc. Co.* v. *Trust Co.* (1906) 148 Cal. 457, 467 [83 P. 1003].)

█ Reliance upon such evidence of "practical construction" is subject to one limitation: " 'In determining the meaning of an ambiguous contract the interpretation placed on the contract by the parties themselves may be considered only when the acts of the parties were positive and deliberate and done in attempted compliance with the terms of the agreement.' " (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc., supra,* 263 Cal.App.2d at p. 538.)

█ The trial court was entitled to rely on respondents' evidence that appellant from July 1, 1959, when he disclosed the inventions, unqualifiedly represented that he owned them under the terms of his employment agreement. This was found not to be true in law or fact. Since Mr. Grove and his counsel Mr. Flehr each had a fiduciary duy toward the Walworth Company,[3] the directors were entitled to and did accept at face value Mr. Grove's assertions of ownership of the inventions. Only after the directors received the letter and memorandum directed to them by Mr. Pokross on May 10, 1960, a doubt arose concerning Mr. Grove's ownership of the

---

[3] It is to be noted, that after the acquisition of the Grove Corporations by Walworth, Mr. Grove still was permitted to continue in charge without any apparent supervision by the directors which would tend to disclose to them what had occurred in the shop, as to invention, design or otherwise. Mr. Flehr was also the company's patent adviser.

inventions. The directors' actions before that time did not constitute any "practical construction" of the contract, in the absence of some conscious intention knowingly directed toward doing so. (*Barnhart Aircraft, Inc.* v. *Preston* (1931) 212 Cal..19, 24-25 [297 P. 20].) Therefore, the directors were not bound by such preliminary assumptions of Grove's ownership in their conference memoranda. (Cf. *Regus* v. *Schartkoff* (1957) 156 Cal.App. 2d 382, 388 [319 P.2d 721]; *Stevens* v. *Marco* (1956) 147 Cal.App.2d 357, 377-378 [305 P.2d 669].)

■ Where extrinsic evidence has been admitted, and it is in conflict, any reasonable construction of the instrument by the trial court must be sustained. (*Alperson* v. *Mirisch Co.* (1967) 250 Cal.App.2d 84, 95 [58 Cal. Rptr. 178]; *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc., supra,* 263 Cal.App.2d at p. 537; *Stevens* v. *National Broadcasting Co.* (1969) 270 Cal.App.2d 886, 892 [76 Cal.Rptr. 106].)

■ We conclude that the conduct of the board and the executive committee, in negotiating with Mr. Grove in good faith reliance on his representations of ownership presumably under paragraphs 5 and 10 of the 1959 employment agreement, *without any awareness of the possibility the Walworth Company already owned the inventions under the terms of paragraph 3 of the 1959 employment agreement,* was not "positive and deliberate action" that would constitute a "practical construction" or interpretation of the agreement and that the trial court's rejection of the conduct of the parties subsequent to the execution of the agreement as *paramount* in ascertainment of the true intent of the parties was reasonable and proper under the law. ■ Likewise as enjoined by *Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839], we have considered the construction made, and cannot say the trial court's interpretation is erroneous.

No company will be impaled because it did not sooner discover a constructive fraud in progerss upon it, because of the nondisclosure by a trusted employee that the fruits of property he sought to sell back to the company already grew on the company's own tree, rather than belonging to him. The fact was, that the new inventions were improvements in the use of the O-ring valves, and were not independent of them. The technical testimony established that the O-ring could not be omitted at will. It was employed to secure "trade acceptance" because without such use, the items were not functionally acceptable. Hence, the improvements fell within paragraph 3 of the 1959 agreement.

(c) *Respondents contend that this 1959 agreement was invalid, thus leaving the prior 1956 agreement in effect, for the failure of Grove to dis-*

*close that in fact, he had made inventions under the 1956 contract not transferred or reported to the companies, though he and his counsel, Mr. Flehr, stated there were none.*

In Finding 10, the trial court held it was "unnecessary for the Court to determine with respect to each of the G-5 and Valv-Pak inventions whether such invention was made or conceived before January 21, 1959. However, significant innovations involved in the foregoing patents had been conceived before January 21, 1959, and were in the pre-production developmental and evaluative state normal to an on-going research and development program such as existed in the Grove Company at that time."

At its Conclusion of Law 4, the court stated, "Plaintiff did not breach his fiduciary obligations in the negotiations which culminated in the execution of the 1959 agreement." This conclusion of law cannot stand, in view of Finding 10, *supra,* and Finding 17, and the affirmative assertion by appellant and his counsel that there were no inventions which should be transferred or reported. (*Batson* v. *Strehlow* (1968) 68 Cal.2d 662, 675 [68 Cal.Rptr. 589, 441 P.2d 101].)

There is no such finding or conclusion in respect to the ensuing dealings of the parties.

No cross-complaint seeking rescission of the 1959 agreement was filed. Whether it was void or voidable is not an issue. The respondents' contention does not affect the result reached by the trial court. The breach of the fiduciary relationship negates appellant's claim the contract negotiations construed him into being an owner of patents he didn't own.

(d) *Production while negotiations were pending was equivocal and not determinative as to the parties' construction of the 1959 agreement.*

Appellant's contention that the tooling up and production of the improved valves, pending the negotiation, estops the respondents from claiming the terms of the 1959 contract were not abrogated or amended is not meritorious. (*Spinney* v. *Downing* (1895) 108 Cal. 666 [41 P. 797].) To go into production was not inconsistent with respondents' ownership of the improvement patents, found to exist by the trial court.

II. *The concessions, if any, by respondents, or action under the assumption complete agreement would be reached, in the course of the unsuccessful negotiations, are not independently enforceable contracts.*

As an alternate theory, plaintiff contends that the conduct of the parties established, under Civil Code section 1698, an oral modification of the 1959 employment agreement, in that plaintiff's memorandum of "Proposed Agreement Between Grove (Individual), Grove Valve and Regu-

lator Company and Walworth Company" presented to the board on July 1, 1959 and summarized in the minutes, which memorandum disclosed the inventions and proposed that Walworth enter into contracts with him for royalties, was a proposal to modify the 1959 employment agreement to exclude the new products disclosed by the plaintiff from paragraph 3 and to place them under paragraph 10, which proposal was accepted by the directors when, as indicated in the minutes, "they approved in principle the proposals and that the appropriate agreements should be negotiated with Mr. Grove by the Executive Committee and submitted to the Board for approval."

It is the common understanding that an "approval in principle" implies that there is something less than final agreement with the proposition considered; specific applications of the principle remaining open to subsequent consideration or accord. There was no contract. (*Spinney* v. *Downing, supra,* 108 Cal. 666.)

III. *There was no executed oral agreement to modify paragraph 3 of the 1959 contract. The contention is not available to appellant on this appeal.*

■■■ It seems clear that the parties were not negotiating with the intent to orally modify the 1959 employment agreement. Appellant contended that his new proposals fell outside any performance required by him under the 1959 contract. The theory advanced upon appeal is new to the cause.

Neither during the negotiations, nor upon the trial did appellant ask that the 1959 contract be modified to give him ownership of the inventions. On the contrary, he continually asserted that he owned them already. The negotiations were never completed. ■■■ When tentative subordinate agreements have been reached in the course of negotiations for a new agreement, it is always implied that they are made contingent upon the completion of the final contract. (*Dillingham* v. *Dahlgren* (1921) 52 Cal.App. 322, 326, 329 [198 P. 832], and cases cited.)

■■■ The California law is clear that there is no contract until there has been a meeting of the minds on all material points, despite the fact some terms have been agreed orally, or some action has been taken. (*Kessinger* v. *Organic Fertilizers, Inc.* (1957) 151 Cal.App.2d 741, 749-750 [312 P.2d 345]; *Louis Lesser Enterprises, Ltd.* v. *Roeder* (1962) 209 Cal.App.2d 401, 404-405 [25 Cal.Rptr. 917]; *Apablasa* v. *Merritt & Co.* (1959) 176 Cal.App.2d 719, 730 [1 Cal.Rptr. 500].)

■■■ The compensation to be paid and the areas in which the license was to be exclusive still remained undetermined issues. There could be no

binding contract as to any of the proposed matters until these were resolved. (*Smissaert* v. *Chiodo* (1958) 163 Cal.App.2d 827, 830 [330 P.2d 98]; *Dillingham* v. *Dahlgren, supra,* 52 Cal.App. 322, 326.)

The transaction was not concluded by a resolution of the board of directors that such agreements were to be drawn "with sliding scale basis of royalties and with Mexico and Canada out of them." What the scale was to be was a fundamental contractual question, never resolved.

Even as shown by the minutes at a subsequent directors meeting, the licensing area was in dispute. Negotiations terminated on March 23, 1960.

 Whether a writing has been modified by an executed oral agreement is a question of fact (*Eluschuk* v. *Chemical Engineers Termite Control, Inc.* (1966) 246 Cal.App.2d 463, 469 [54 Cal.Rptr. 711]; cf. *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]).

The question is not, as appellant suggests, whether the pleadings and evidence would support a finding there was an oral modification. We determine whether the findings and judgment as given are supported by substantial evidence.

The findings and judgment of the trial court must stand (*Rabinowitch* v. *California Western Gas Co.* (1967) 257 Cal.App.2d 150, 157 [65 Cal. Rptr. 1]; *Eastwood* v. *Golden State Produce Co.* (1931) 113 Cal.App. 581 [298 P. 838]).

 If the theory of oral modification properly was before the trial court, the findings recited above completely negative the argument advanced. (Cf. *Eastwood* v. *Golden State Produce Co., supra,* 113 Cal.App. 581, 584.) But this new theory of "oral modification" of the 1959 contract cannot be urged for the first time on this appeal, since it involves questions of fact, and not solely questions of law. (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 340-341 [303 P.2d 738].)

### IV. *Respondents' Cross-Appeal Is Not Meritorious*

 Respondents and cross-appellants contend that since the court has decided that they owned the inventions under the terms of the 1959 employment agreement and since plaintiff gave them no voice in the processing of the applications, it was error to award plaintiff the expenses he incurred in processing application for patents.

The trial court made the following finding: "18. Prior to June 13, 1966, plaintiff incurred certain expenses in seeking to perfect domestic and foreign patents on the G-5 and Valv-Pak inventions and on the cross-complaint inventions. These expenses were reasonable in amount. Expenses thus incurred as to the G-5 and Valv-Pak inventions total $43,238.75. Expenses thus incurred as to the cross-complaint invention that is the subject of United States Patent 3076631 total $11,079.30. Expenses thus incurred as to the remaining cross-complaint inventions total $10,496.94."

The trial court then concluded that defendants were entitled to ownership of the G-5 and Valv-Pak inventions and the cross-complaint inventions, and to assignment from plaintiff of all such patents and patent applications *provided* defendants reimburse plaintiff for the patent expenses incurred by him, plus expenses reasonably and necessarily incurred from June 13, 1966, to the date of transfer.

As president of the Grove company, M. H. Grove had the final decision as to whom would be designated as the inventor on inventions developed within the company organization. The court in Finding 13 held that appellant was at least a co-inventor of each of the G-5 and Valv-Pak improvements.

At the directors meeting of August 31, 1959, the Walworth directors authorized M. H. Grove on behalf and in the name of the company to negotiate and enter into licensing agreements with foreign firms, on the Seal-O-Ring feature insofar as the same is used in the "G-5" and "Valv-Pak" valves. This necessarily assumed as a practical business matter that patenting in the foreign countries concerned would be antecedent to or contemporaneous with such licensing; and that expenses would be incurred.

The trial court found the expenses incurred by plaintiff to be reasonable. Some of the inventions have been used in products manufactured and sold by the cross-appellants and thereby they have incurred a benefit. The test is not whether the sale of the product produced a profit.

"A person is entitled to specific restitution of property from another or to the product of such property *only on condition that he compensate the other for expenditures with reference to the subject matter which have inured to his benefit,* to the extent that justice between the parties requires." (Rest., Restitution, § 158; italics added.) Patents have the attributes of personal property (35 U.S.C. § 261). The extent to which justice requires reparation was a factual issue, concluded by the finding of the trial court, before which the same contentions were raised. We conclude that respondents and cross-appellants would be unjustly enriched were they not to reim-

burse the plaintiff for expenses incurred in securing the patents (Rest., Restitution, §§ 1, 43).

The alleged absence of specific control of the expenditures by respondents was one consideration before the trial court. Any such absence of control is immaterial since the court found the expenditures were reasonable. Under the circumstances, it can hardly be contended that respondent did not wish protection for the patent rights it owns. He who takes the benefit must bear the burden. (Civ. Code, § 3521. Compare the similar situation: *Employers etc. Ins. Co.* v. *Pacific Indem. Co.* (1959) 167 Cal.App.2d 369, 379 [334 P.2d 658], quoting from 50 Am. Jur. p. 699, § 23, involving subrogation where one having an ostensible interest to protect, pays another's debt.)

After having successfully contended that the improvement patents belong to them, it ill behooves respondents to suggest their invalidity in opposition to such a requirement. A patent is presumed valid (35 U.S.C. § 282). No third party has questioned the patents' validity. Validity of necessity must be supported by Grove if it is to profit by sale of its valves, both domestically and in the foreign market. In its brief submitted to the trial court these cross-appellants themselves asserted that any claim of joint invention as between Grove and other employees, or of invention by their employee Bryant could not affect their rights to use and license the inventions. The trial court adopted this view in its memorandum decision and in its findings.

Since this is an equitable proceeding, the right of the respondents in this regard should be safeguarded as completely as possible. The trial court has retained jurisdiction to enforce the provisions of the judgment. That enforcement should include the following, and the judgment is ordered modified and amended by addition of the following to paragraph 6 thereof:

"Likewise, plaintiff and his agents, servants, employees, executors, administrators and assigns, and all persons acting in concert and participation with him, and all organizations which are now or shall hereafter be owned or controlled by him, are hereby enjoined from claiming or asserting the invalidity of any of the patents, foreign or domestic referred to in Appendix A hereof; and plaintiff is hereby ordered, in the event of any proceeding or procedure to assert or maintain the validity of any of said patents to execute any and all documents necessary whether in proceedings to correct errors, as under 35 U.S.C. section 256, or otherwise, as required; and to bear any costs or expenses thereof found equitably due from him to the owners thereof."

In Conclusion of Law 4, the word "not" is ordered stricken; and as so

amended the language of said paragraph also is ordered to be added to the Findings of Fact immediately following the existing Finding 10.

With such amendments, and the modification of the judgment herein ordered, the judgment is affirmed.

Shoemaker, P. J., and Taylor, J., concurred.