[Civ. No. 32900. Second Dist., Div. One. Mar. 21, 1969.]

GEORGE STEVENS, Plaintiff and Appellant, v. NATIONAL BROADCASTING COMPANY et al., Defendants and Respondents.

Slaff, Mosk & Rudman and Norman G. Rudman for Plaintiff and Appellant.

O'Melveny & Meyers, Rodney K. Potter and Rodney E. Nelson for Defendants and Respondents.

LILLIE, J.—The principal issue is whether the trial court erroneously construed the provisions of an employment contract relating to plaintiff's "cutting" or "editing" rights in certain motion pictures produced and directed by him, after their completion and upon exhibition on television. One such picture, "A Place in the Sun," was televised by defendant National Broadcasting Company under a licensing agreement with defendant Paramount Television Productions, Inc., a subsidiary of defendant Paramount Pictures Corporations which owned the film. The extent of "editing" rights in two other similarly owned pictures, "Shane" and "Something to Live for," was also litigated. In connection with all three films, plaintiff sought injunctive relief, damages both ex contractu and ex delicto, and a declaratory judgment to resolve the parties' conflicting claims under the contract. The trial court denied an injunction, awarded plaintiff one dollar by way of nominal damages for a technical violation of the agreement and declared the rights and duties of the parties with respect to the three films as follows: (a) Defendant Paramount Pictures Corporation is the owner of said pictures

and all rights therein; (b) it has the right to license said pictures for exhibition on television with interruptions for commercials; and defendant National Broadcasting Company, as Paramount's licensee with respect to "A Place in the Sun," has the right to thus exhibit said picture; (c) the making of deletions from the pictures is a breach of plaintiff's employment agreement unless they are required to effect distribution. Plaintiff appeals from the judgment.

 Appellant challenges the sufficiency of the evidence to support finding No. 43 upon which the foregoing determination was partially based: "The interruption of the pictures for and the insertion of commercials in the television program is not cutting and editing of the pictures as referred to in plaintiff's employment contract." Additionally, he contends (1) finding No. 43 above is wholly inconsistent with, and contrary to, findings Nos. 44 and 45[1] and (2) that the making of the latter two findings constituted reversible error.

By the terms of the employment agreement entered into on January 1, 1946, plaintiff agreed to render his exclusive services to Liberty Films, Inc., as producer-director; subsequently the agreement was assigned to defendant Paramount Pictures when the latter acquired all of Liberty's assets, and all three pictures here involved were produced and directed by plaintiff after the assignment. Originally the entire outstanding stock of Liberty was owned by plaintiff, Frank Capra and William Wyler (likewise film producers and directors) and Samuel Briskin. In November and December of 1945 plaintiff, Capra and Wyler had numerous discussions regarding the right of each to complete control over the form and content of each film to be produced by them for Liberty. Subsequent thereto identical employment contracts giving each director-producer the desired control over his particular picture were entered

[1]"44. NBC did make minor deletions from the motion picture "A Place in the Sun" which did not affect its dramatic or artistic content. The integrity of the picture was preserved. The making of said deletions did not have any effect on plaintiff's reputation or otherwise injure him."

"45. Under plaintiffs' employment agreement the unusual and rare grant to plaintiff of sole control over production prevented subsequent deletions not required for distribution of the picture. The deletions which were made were not a requirement for distribution of the picture on television. The particular format used and time period allocated for the television exhibition allowed the motion picture to be shown in its entirety. The deletions were made with the intent to smooth the transition from the motion picture to the commercials and to improve the television exhibition. The deletions were a technical breach of plaintiff's employment contract."

into. The agreement herein is one such contract; it is in the form of a letter to plaintiff (which he "Accepted and Approved") from "Liberty Films, Inc., By Frank Capra." Paragraph SECOND thereof reads in pertinent part: ". . . You shall have sole control of the production and direction of the photoplay consistent with the total budget approved for it; if the total budget shall be exceeded, we [Liberty] shall have the right thereafter to control the production of the photoplay, but the right to edit, cut and score said photoplay shall remain with you."

The agreement also included the following provisions:

"FIFTH: You agree that material or intellectual property that you may create, prepare or contribute during your employment hereunder, and all rights therein and benefits therefrom, shall be our sole property, and you agree to execute certificates of our ownership thereof at our request.

"EIGHTH: We agree that all photoplays produced and directed by you hereunder and all advertising thereof issued by us or under our control shall bear substantially the following legend:

"LIBERTY FILMS PRESENTS

GEORGE STEVENS'

(Title of Picture)

(Cast Credits)

PRODUCED AND DIRECTED BY

GEORGE STEVENS"

or

"LIBERTY FILMS PRESENTS

(Name of stars)

IN GEORGE STEVENS'

(Title of Picture)

(Cast Credits)

PRODUCED AND DIRECTED BY

GEORGE STEVENS"

"In no event shall any other producer credit appear on said photoplay or in said advertising, and the said credits, billing and advertising shall be similar to those employed to announce the photoplays produced by Mr. Frank Capra and Mrs. William Wyler for us. The type of credit hereinbefore outlined shall not be substantially departed from unless consented to in writing by you, Mr. Frank Capra and Mr. William Wyler, if they or he shall then be employed by us, in the announcements of the photoplays produced and directed by either of you.

"SIXTEENTH: You hereby agree that each photoplay produced and/or directed by you hereunder and each subject or vehicle selected therefor shall conform to the requirements and standards set by the terms of any contract for the distribution of said photoplays which we may enter into and to the requirements of any lending agreement which we may execute with a bank or other financial institution or individual providing finances for the production of said photoplays, and that the script or screenplay to be utilized in the production of each photoplay hereunder shall first be approved under and pursuant to the so-called Hays Code or other requirements which may prevail throughout the motion picture industry."

■ Although they do not deal expressly with "editing" and "cutting," consideration necessarily must be given to the last quoted three paragraphs becaue it is the statutory rule that "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) Under FIFTH, supra, Liberty was specifically granted the sole ownership of the pictures produced with "all rights therein and benefits therefrom." Too, the contract being one of employment, the rule is settled that "Where an employe creates something as part of his duties under his employment, the thing created is the property of his employer unless, of course, by appropriate agreement, the employe retains some right in or with respect to the product. [Citation.]" (Zahler v. Columbia Pictures Corp., 180 Cal.App.2d 582, 589 [4 Cal. Rptr. 612].) Accordingly, in the present case, was there an appropriate provision restricting or limiting Liberty's otherwise complete dominion over the "products" in question which is reflected in the provisions of the FIFTH paragraph? We find such restrictions in the EIGHTH, supra, whereunder plaintiff is given film credits by the legend therein expressly spelled out, but we find no such express covenant in paragraph SECOND giving plaintiff, as he contends, the exclusive right to edit, cut and score his pictures at all stages, both before and after completion. Nothing at all being therein stated about post-production editing, the meaning asserted by plaintiff must arise by implication from the language used.

■ But, as shown by controlling decisions, implied covenants are held to be justified only when not inconsistent with some express term of the contract and when, in the absence of such implied term, the contract could not be effectively performed. (Tanner v. Title Ins. & Trust Co., 20 Cal.2d 814, 824 [129 P.2d 383].)

In two partially similar cases, neither of which is mentioned in appellant's briefs, the principle referred to in *Tanner* was applied. The first, *Lillie* v. *Warner Bros. Pictures, Inc.*, 139 Cal.App. 724 [34 P.2d 835], involved a contract under which defendant Warner Bros. acquired "full ownership in the picture, subject only to the limitations contained in the contract." (P. 728.) Since there were apparently no specific limitations upon the artist's right to prevent exhibition of the picture as a short, it was held that defendant's acquisition of its full ownership "included the right to use the picture publicly in any form of exhibition, except as such right is limited by the terms of the contract." (P. 728.) In the second case, *Republic Pictures Corp.* v. *Rogers* (9th Cir. 1954) 213 F.2d 662, it was contended by the artist that the exhibition of motion pictures, wherein he was the leading actor, upon commercially sponsored television programs constituted an advertising use of his name, picture and voice, which right was not granted by the contract in suit. After noting that the actor had been paid full measure for his services in creating the films, and had specifically relinquished all rights of every kind and character therein, the court held (citing *Tanner*) "We are bound to give effect to the meaning of that agreement, that grant, and are bound not to cut it down by implication from another grant unless it is necessary to the effective operation of the contract." (P. 666.) Implied covenants not being favored and resorted to only when they are indispensable to effectuate the intention of the parties, the provisions of paragraph Sixteenth militate against their use to plaintiff's advantage in the present case. Under Sixteenth the parties agreed that the pictures "shall conform to the requirements and standards set by the terms of any contract for the distribution of said photoplays which we may enter into. . . ." If the contract be taken by its four corners, paragraph Second when read with paragraph Sixteenth does not call for the construction advanced by plaintiff; certainly, if Liberty was to have the normal right of an owner to effect distribution, it had the accompanying right to take such steps as would "conform to the requirements and standards" specified in the instrument at bar. Furthermore, under paragraph Second the sole control of the several films given to plaintiff governs their "production" and not their distribution.

We deem it unnecessary to further pursue the instant point. Finding No. 43 is supportable on the basis of the express language used in the contract; and, in any event, the extrinsic

evidence introduced during the course of the trial, both as to custom and usage and the contemporary conduct of the parties, amply sustains the determination presently challenged. Disregarding, as we must, testimony to the contrary, it was shown by competent witnesses that "production" activities were distinct from "distribution" activities. Thus, the term "production" was defined as "the making of the picture up to the delivery of a completed picture to the company that was either the employer or to the distributor of the picture." Similar testimony was given by Jack L. Warner, who produced his first picture in 1912 and who, at the time of trial, had been involved in the making of more than 5,000 films. The effect of such testimony clearly negated plaintiff's claim that the right to edit, cut and score under his "sole control of production" included cutting and editing after the picture's completion. Nor can we accept plaintiff's argument that the question as to the meaning of the terminology is one of law. (*Parson* v. *Bristol Dev. Co.*, 62 Cal.2d 861 [44 Cal. Rptr. 767, 402 P.2d 839]) ; to the contrary, the correct rule governing here is that where extrinsic evidence has been admitted, and it is in conflict, any reasonable construction below will be sustained. (*Alperson* v. *Mirisch Co.*, 250 Cal. App.2d 84, 95 [58 Cal.Rptr. 178].)

In addition to the above testimony favoring the interpretation reached by the trial court, evidence was received indicating that Liberty Films, at or about the time of the execution of the agreement, was granting post-production cutting and editing rights to pictures which it owned. As shown earlier, plaintiff was one of three parties (producers and directors) who controlled Liberty, and admittedly he was consulted on major questions of company policy. Two such written contracts of Liberty were received in evidence, one dated before and one after the instant agreement. Defendants properly point out that if these two documents followed the custom of owners in allowing others to re-cut and re-edit its films in the course of distribution, all the parties thereto interpreted paragraph SECOND in a manner wholly inconsistent with that presently advanced by plaintiff. Of interest is the granting in said documents of television rights; and of equal interest is the fact that one such picture was to be produced by Mr. Capra whose employment contract, according to plaintiff, was "in all essential matters the same." Of course, plaintiff was not a party in his individual capacity to either of the two contracts mentioned, thus he questions whether he is bound by the prin-

ciple that the conduct of the parties, subsequent to the execution of the agreement, may be considered in determining its meaning. (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 761 [128 P.2d 665].) The evidence certainly establishes custom and usage; and we are also inclined to the view that in light of plaintiff's close relationship to the management of Liberty's business affairs, the construction apparently given the pertinent language by his business associates might well be imputed to him.

We come now to appellant's argument that there is an inconsistency between the court's finding (No. 44) that certain minor deletions were a breach of plaintiff's contract and finding No. 43 that the interruption of the picture for commercials was not. There is no substance to such claim. Contrary to plaintiff's contentions, the trial court did not find that the subject deletions were "cutting and editing" as referred to in his employment contract; instead, and based upon evidence of custom in that regard, the court inserted in finding No. 45 the proviso excepting deletions which were required for distribution of the picture: "Under plaintiff's employment agreement the unusual and rare grant to plaintiff of sole control over production prevented subsequent deletions not required for distribution of the picture." The finding further declared that the deletions were unrelated to any requirement for distribution, clearly implying that they affected the content of the picture. The effect on the film's content was otherwise, however, with respect to the commercials which plaintiff refers to as the injection of foreign matter in the film itself. The court viewed the television program, and there was testimony by qualified witnesses that the picture was not changed nor the content affected by the commercial interruptions. As declared in finding No. 44, "The integrity of the picture was preserved." No contradiction appears; too, any claimed inconsistencies fall far short of the requirements warranting a reversal. (*Richter* v. *Walker*, 36 Cal.2d 634, 639 [226 P.2d 593].)

Plaintiff's final point is that it was error to deny an injunction and award any damages. The court found upon conflicting evidence that plaintiff suffered no actual damage as a result of defendants' conduct; for example, Jack Warner testified that plaintiff's ability to command the highest compensation was not adversely affected by the televising of his films. Since plaintiff admits that evidence on both sides of the

issue was offered, and since the granting of a permanent injunction is largely within the discretion of the court (27 Cal.Jur.2d, p. 115, § 11), under no circumstances can it be said that appellate interference is called for as to this aspect of the case.

The judgment is affirmed.

Wood, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied April 16, 1969, and appellant's petition for a hearing by the Supreme Court was denied May 14, 1969. Mosk, J., did not participate therein.