MARVIN L. SPECK AND STANLEY E. GILLILAND v. NORTH CAROLINA
DAIRY FOUNDATION, INC., THE BOARD OF GOVERNORS OF THE UNI-
VERSITY OF NORTH CAROLINA, THE BOARD OF TRUSTEES OF
NORTH CAROLINA STATE UNIVERSITY, A CONSTITUENT INSTITUTION AND·
THE ACTING CHANCELLOR OF NORTH CAROLINA STATE UNIVER-
SITY

No. 566A83

(Filed 28 August 1984)

**Fiduciaries § 2; Master and Servant § 11.2— inventions and discoveries by em-
ployee—ownership by employer**

Plaintiffs did not acquire any interest in a secret process for the use of
lactobacillus acidophilus in dairy products which they discovered while
employed as professors and researchers by N. C. State University and while
using resources provided them for their research by the University absent a
written contract by the University to assign. Therefore, defendants owed no
fiduciary duty to plaintiffs as a result of plaintiffs' confidential revelation to
the University of the secret process which it already owned, and plaintiffs
were not entitled to impose a constructive trust on royalties received by the
N. C. Dairy Foundation for its licensing of the use, under the trademark
"Sweet Acidophilus," of the secret process discovered by plaintiffs.

APPEAL of right under N.C.G.S. 7A-30(2) from the decision of
a divided panel of the Court of Appeals, 64 N.C. App. 419, 307
S.E. 2d 785 (1983), reversing summary judgment for the defend-
ants entered by *Judge Robert L. Farmer* on July 2, 1982 in
Superior Court, WAKE County. Heard in the Supreme Court
March 14, 1984.

*Boyce, Mitchell, Burns and Smith, P.A., by Lacy M. Presnell,
III and Susan K. Burkhart, for the plaintiff-appellees.*

*Poyner, Geraghty, Hartsfield and Townsend, by Thomas L.
Norris, Jr. and Cecil W. Harrison, Jr., for the defendant-appellant
North Carolina Dairy Foundation, Inc.*

*Rufus L. Edmisten, Attorney General, by Thomas J. Ziko,
Associate Attorney, for the defendant-appellants The Board of
Governors of the University of North Carolina, The Board of
Trustees of North Carolina State University, and The Acting
Chancellor of North Carolina State University.*

MITCHELL, Justice.

The underlying issue controlling the result in this case is whether the plaintiffs acquired any interest in a secret scientific process at the time they discovered it while employed by the defendant North Carolina State University. We hold that they did not. Accordingly, we reverse the decision of the Court of Appeals.

The plaintiffs brought this action seeking to impose a constructive trust upon royalties received by the defendant North Carolina Dairy Foundation (hereinafter "Foundation") for its licensing of the use, under the trademark "Sweet Acidophilus," of a secret process discovered by the plaintiffs. In support of this claim, the plaintiffs alleged that throughout the 1960's and the early 1970's they developed a secret process for the use of lactobacillus acidophilus in dairy products which made the production and marketing of "Sweet Acidophilus" milk possible. They alleged that they developed the secret process while employed by the defendant North Carolina State University (hereinafter "University") and that the defendants learned of the process because of their fiduciary relationship with the plaintiffs. The plaintiffs further alleged that the defendants had breached their fiduciary duties to the plaintiffs.

The defendants' motions for summary judgment came on for hearing before Judge Farmer. After considering the pleadings, affidavits, pertinent discovery, briefs and arguments, Judge Farmer allowed summary judgment for the defendants.

The plaintiffs gave timely notice of appeal to the Court of Appeals from the entry of summary judgment. The Court of Appeals reversed and remanded the case to Superior Court, Wake County, for further proceedings. Judge Hedrick dissented, and the defendants gave notice of appeal of right to the Supreme Court.

Summary judgment for the defendants was proper only if the pleadings and evidence before the trial court taken in the light most favorable to the plaintiffs showed no genuine issue of material fact and that the defendants were entitled to judgment as a matter of law. *Flippin v. Jarrell*, 301 N.C. 108, 270 S.E. 2d 482 (1980). We turn then to a review in such light of the pleadings and evidence before the trial court.

From 1957 until his retirement in June, 1979, the plaintiff, Dr. Marvin L. Speck, was a William Neal Reynolds Professor of Food Science and Microbiology at the University. He was engaged in this capacity in teaching and research on the use of high temperature for the pasteurization and sterilization of foods and the development of standards for attaining public health safety in processing treatments. In this capacity he also conducted research with micro-organisms used in food manufacturing—primarily lacticstreptococci, lactobacilli, and leuconostocs. As a part of such research, he conducted experiments and research with regard to the feasibility of developing a pleasant tasting milk containing lactobacillus acidophilus. Lactobacillus acidophilus is a bacteria that minimizes or eliminates certain undesirable micro-organisms in the human intestinal tract and is believed by many in the scientific community to contribute to more favorable digestion, improved general health and longevity.

Milk containing lactobacillus acidophilus has been produced for decades since the development in 1931 of a process for adding the bacteria to milk and has been known as acidophilus milk. This process caused the milk to have a sour flavor because it had to be heated to high temperatures for an extended period of time before the lactobacilli could be introduced. Additional work in improving such processes was done by scientists at Oregon State University around 1958. Their research appears to have been very similar to that conducted by the plaintiffs.

With the assistance of the plaintiff, Dr. Stanley E. Gilliland, who was at all pertinent times an Assistant Professor of Food Science at the University, the plaintiff, Dr. Speck, conducted research into methods of preparing acidophilus milk so as to eliminate the sour flavor. As a result of a course of research, experiments and study conducted at the University during the 1960's and 1970's, the plaintiffs ultimately developed new procedures and technology for the easy preparation and preservation of concentrates of lactobacillus acidophilus and a process by which the bacteria could be added to milk without causing the milk to have a sour flavor.

Dr. Speck informed Dr. William Roberts, head of the Department of Food Science at the University of the plaintiffs' discovery in a memorandum dated September 15, 1972 in which he said that

there was nothing sufficiently novel about the process to "warrant the filing of a patent application on this product or means for its manufacture." He suggested the possibility of the use of a trademark and the licensing of dairies to use the trademark and the process discovered by the plaintiffs. Dr. Roberts suggested to Dr. Speck that he submit a proposal to the University's Patent Committee recommending that the licensing and marketing of acidophilus milk produced by the use of the secret process be handled through the Foundation.

The Foundation is a nonprofit corporation engaged in the support of research for the public good. From time to time it provides funds in support of research at the University. The Foundation and the University maintain a close relationship and the Vice-Chancellor of Foundations and Development of the University serves as the Secretary of the Foundation.

Dr. Speck submitted a proposal concerning acidophilus milk to the Patent Committee. Dr. Speck and Dr. Roberts were invited to appear before the Patent Committee at its meeting on October 19, 1972. The minutes of that meeting of the Patent Committee show that:

> Dr. Speck briefly outlined the background of his research and he and Dr. Roberts explained the way in which they proposed to get the product on the market. In general, they proposed to work through the North Carolina Dairy Foundation and employ a patent attorney to advise on the desirability of obtaining either a trademark or a copyright. Cost of the venture would be borne by the Dairy Foundation and a licensing of any trademark obtained would be handled through that organization. After a brief discussion by the Committee, which brought out that a patent application was not feasible, Mr. Conner moved that the request be approved and the motion was seconded by Dr. Bennett. Motion carried unanimously.

At the annual meeting of the Foundation on October 28, 1972, Dr. J. E. Legates, Dean of the School of Agriculture and Life Sciences of the University, made a presentation concerning Dr. Speck's discovery. The minutes of that meeting show that Dean Legates:

stated that this new process had been taken before the Patent Committee of the University and, with the approval of President [of the Foundation] Davenport, the [University] Patent Committee was applying for a patent on [sic] a trademark for the product through the Dairy Foundation. Dean Legates said that any funds derived through the licensing of the trademark for the acidophilus milk would accrue to the Dairy Foundation and requested that the Board of Directors appropriate up to $3,000 to register the trademark and to develop a merchandising proposal for its promotion.

During this same meeting of the Foundation, which Dr. Speck attended, a motion was made for the President of the Foundation to appoint a committee composed of a producer, a processor, and a supplyman "to work with the appropriate people at the University to carry out this activity." The motion was passed.

In 1973, the Foundation requested that Dr. Speck work with Miles Laboratories, Inc. and other companies to explore possible arrangements for the manufacturing of the cultures to be used in producing the bacteria for acidophilus milk. The only question Dr. Speck raised in the initial stages of the preparations for production and marketing of the acidophilus milk was whether the ownership of the trademark "Sweet Acidophilus" would be in the name of the University or the name of the Foundation. On January 9, 1974, Dr. Speck called Dr. Rudolph Pate, Vice-Chancellor for Foundations and Development at the University and Secretary of the Foundation, to ask if it was not true that the Foundation would own the trademark. Dr. Pate informed him that this was correct.

During 1974, Dr. Speck, Dr. Roberts, Dean Legates and other University officials worked with the Foundation to find a licensee to market "Sweet Acidophilus" milk. All of these individuals were employed by and paid by the University at all times pertinent to this appeal. As a result of their efforts, an agreement was entered on December 18, 1974 between the Foundation, G. P. Gundlach & Company and Miles Laboratories, Inc., whereby G. P. Gundlach & Company agreed to handle marketing, product development and promotion of "Sweet Acidophilus" milk and Miles Laboratories, Inc. agreed to produce the lactobacillus acidophilus cultures.

The University sponsored a luncheon on April 18, 1975 to announce the development of "Sweet Acidophilus" milk. In a letter about the luncheon, Dr. Pate stated that:

We believe that the development and franchising of this culture nationally are two very significant activities in food science and constitute notable accomplishments of the University.

In form letters about the luncheon, Dr. Pate also wrote that:

North Carolina State University will review details of the development of a new acidophilus culture by its food scientists and the plans to merchandise this important new product throughout the nation at a special luncheon at the University Faculty Club, Friday, April 18, at 1:00 p.m. The Acidophilus culture is being marketed through a franchise arrangement by the North Carolina Dairy Foundation, Inc. . . .

Dr. Speck wrote to Dr. Roberts on November 3, 1975 stating that he thought it was:

Entirely proper for the Dairy Foundation to be selected for the commercial development and marketing of "SWEET ACIDOPHILUS" and to be the University's agent to receive any royalties from our development. In attending to the various legal aspects of this project (which was the first experience for a number of us) participation by the inventor in the royalties was overlooked. It would seem that now is an appropriate time to take care of this matter.

In a November 10, 1976 response to Dr. Speck from Dr. Clauston Jenkins, Assistant to the Chancellor and Legal Advisor to the University, the University denied that Dr. Speck had any right to share in the royalties. Dr. Speck replied by a memorandum dated December 3, 1976 renewing his request for a share in the royalties.

On January 23, 1978, the Chairman of the University's Patent Committee wrote a memorandum to Dr. Joab Thomas, Chancellor of the University, recommending the University consider making a one time payment to Dr. Speck of fifteen percent of the royalty income from the successful marketing of the "Sweet Acidophilus" trademark. He based his recommendation on the fact that others

in the same department with Dr. Speck at the University had received, under the written Patent Policy of the University, fifteen percent of the royalty income from patents on their inventions. He suggested that the University adopt a similar approach to be applied to trademarks not covered by the written Patent Policy in order to prevent the possibility of the development of "hard feelings and tensions" within the faculty. No royalty income was paid to Dr. Speck. Approximately four years later, on December 11, 1981, the plaintiffs, Dr. Speck and Dr. Gilliland, instituted the present lawsuit.

The plaintiffs alleged in their complaint that the defendants learned of the secret process for the preparation and use of lactobacillus acidophilus in dairy products as a result of their fiduciary relationship with respect to the plaintiffs. The plaintiffs also alleged that the defendants breached their fiduciary duties by using the secret process to their own advantage. The plaintiffs further alleged that the defendants' violation of their fiduciary duties entitled the plaintiffs to a constructive trust on the proceeds from the secret process and from the trademark "Sweet Acidophilus" which was obtained by the defendant Foundation, since both represent "the culmination of the plaintiffs' ingenuity and efforts." We do not agree.

A confidential or fiduciary relationship exists in all cases where there has been a special confidence reposed in one who "in equity and good conscience is bound to act in good faith and with due regard to the *interests* of the one reposing confidence." *Abbitt v. Gregory*, 201 N.C. 577 at 598, 160 S.E. 896 at 906 (1931) (emphasis added). If the plaintiffs never had any interest in the process which they developed while employed by the University, the defendants did not stand in a fiduciary relationship to the plaintiffs with regard to the process. Further, even if a fiduciary relationship existed between the parties, the defendants were required only to refrain from abusing the confidence placed in them by taking advantage to themselves *at the expense of the plaintiffs*. *Vail v. Vail*, 233 N.C. 109 at 114, 63 S.E. 2d 202 at 206 (1951). Therefore, the threshold issue to be resolved on this appeal is whether the plaintiffs acquired any interests cognizable in equity or at law at the time they developed the secret process in question. We hold that they did not.

The respective rights of employer and employee in an invention or discovery by the latter arise from the contract of employment. *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933). The fruit of the labor of one who is hired to invent, accomplish a prescribed result, or aid in the development of products belongs to the employer absent a written contract to assign. *E.g., Vigitron, Inc. v. Ferguson,* 419 A. 2d 1115 (N.H. 1980); *Amoco Production Co. v. Lindley,* 609 P. 2d 733 (Okla. 1980); *Whites' Electronics, Inc. v. Teknetics, Inc.,* 677 P. 2d 68 (Or. App. 1984); *Stevens v. National Broadcasting Co.,* 270 Cal. App. 2d 886, 76 Cal. Rptr. 106 (1969). In such instances:

> If the employee fails to reach his goal the loss falls upon the employer, but if he succeeds in accomplishing the prescribed result then the invention belongs to the employer even though the terms of employment contain no express provision dealing with the ownership of whatever inventions may be developed.

*National Development Co. v. Gray,* 55 N.E. 2d 783 at 787 (Mass. 1944).

In the instant case the plaintiffs' pleadings reveal that they developed the secret process for improved methods of preparation and preservation of concentrates of lactobacillus acidophilus while employed as teachers and researchers to engage *inter alia* in just such research and development for the University. At all times pertinent, the plaintiffs' salaries were paid by the University. Additionally, the plaintiffs candidly acknowledged during oral argument that the University was the place where they discovered the secret process and that the resources provided them for their research by the University enabled them to discover the process. Under these facts, the secret process developed through the research of the plaintiffs belonged to the University absent a written contract by the University to assign.

Regrettably, the plaintiffs in the instant case were not employed pursuant to a written contract detailing their duties as professors and researchers. It is clear, however, that the plaintiffs were permitted and encouraged by their employer the University to conduct the precise research which led to the discovery and perfection of the secret process. It is equally clear that the plaintiffs performed this work on their employer's time and using their

employer's research resources and that they were paid a salary to do so. As it has been clearly stated:

> It matters not in what capacity the employee may originally have been hired, if he be set to experimenting with the view of making an invention, and accepts pay for such work, it is his duty to disclose to his employer what he discovers in making the experiments, and what he accomplishes by the experiments belongs to the employer.

*Houghton v. United States*, 23 F. 2d 386 at 390 (4th Cir. 1928).

Further, the written Patent Policy of the University was not a written contract to waive the University's rights in the secret process or to assign all or any part of those rights to the plaintiffs. That policy merely assigns fifteen percent of the royalties from any *patent* obtained on an invention by an employee of the University to the inventor. The secret process developed by the plaintiffs was not patentable, and this fact was recognized by the plaintiffs at the time they discovered the process. The written Patent Policy adopted on November 16, 1973 by the defendant, The Board of Governors of The University of North Carolina, simply was silent as to trademarks and trade secrets. The defendant Board of Governors is responsible for the general control and management of the defendant University and fifteen other constituent institutions. N.C.G.S. 116-11. There is no indication in the record on appeal that the defendant Board of Governors has ever authorized or approved an amendment to its written Patent Policy in any way to cover trademarks and trade secrets.

As the secret process in question belonged to the University immediately upon its discovery by the plaintiffs, the plaintiffs never possessed any interest cognizable in equity or at law in the process. Therefore, the defendants owed no fiduciary duty to the plaintiffs as a result of the plaintiffs' confidential revelation to the University of the secret process it already owned. Indeed, any fiduciary duty owed with regard to the secret process was owed by the plaintiffs to the University in its capacity as the employer who had employed them to develop the process.

The plaintiffs pointed out during oral arguments that the November 10, 1976 letter to Dr. Speck from Dr. Jenkins, Assistant to the Chancellor and Legal Advisor to the University, character-

ized the actions of the Patent Committee of the University as "returning" all rights to Speck after concluding that the secret process was not patentable "to dispose of as you saw fit." They pointed out that Dr. Jenkins then took the position that the plaintiffs had waived any rights they had in the secret process in favor of the Foundation. The plaintiffs argued that the position taken by Dr. Jenkins, together with arguments made by the defendants in their briefs on appeal, alleged certain facts pertaining to the relationship between the plaintiffs and the defendants which caused the principles of law previously discussed in this opinion to be inapplicable. The plaintiffs argued that, if the construction given the facts by Dr. Jenkins and the defendants was correct, the plaintiffs own or did own rights in the secret process and that any remaining questions are questions of fact which the plaintiffs were entitled to have resolved by a jury. We do not find this argument persuasive.

The correspondence and actions of the parties previously reviewed herein clearly reveal that the plaintiffs at all pertinent times held the correct opinion that the secret process they had discovered belonged to the University and that the University was merely waiving its rights in favor of the Foundation or using the Foundation as its agent for marketing. Dr. Speck's letter of November 3, 1975 reveals that he clearly held this opinion. The letters by Dr. Pate and the statements by Dean Legates during the meeting of the Foundation attended by Dr. Speck on October 28, 1972 — both previously set forth herein — could only have tended to lead Dr. Speck to hold the same opinion.

In any event, the characterization of facts concerning prior relationships of the parties by one of them does not control in a lawsuit. If in equity and at law the plaintiffs had no right to the secret process, and we have held that they did not, efforts by the defendants to construe the facts after they had occurred could not give the plaintiffs that which equity and the law did not give them.

Finally, it is worthwhile to note that the University and the Foundation are not dedicated to making and retaining profits, but instead use their income for the good of the public by promoting and financially assisting scientific research for the common good. Acidophilus milk is viewed by many experts as promoting good

health and increasing longevity and, thereby, as improving the human condition. Judge John J. Parker perhaps exhibited remarkable foresight and anticipated a case similar to the instant case when he wrote:

> It is unthinkable that, where a valuable instrument in the war against disease is developed by a public agency through the use of public funds, the public servants employed in its production should be allowed to monopolize it for private gain and levy a tribute upon the public which has paid for its production . . .

*Houghton v. United States*, 23 F. 2d 386 at 391 (1928).

The decision of the Court of Appeals reversing summary judgment for the defendants is reversed. The case is remanded to the Court of Appeals with instructions to reinstate the summary judgment for the defendants entered by the trial court.

Reversed and remanded.